**J. P. STEVENS & CO., Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**TEXTILE WORKERS UNION OF AMERICA, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**J. P. Stevens & Co., Inc., Intervenor.**

**Nos. 390, 389, Dockets 30914, 30391.**

United States Court of Appeals Second Circuit.

Argued May 5, 1967.

Decided July 7, 1967.

Daniel B. Jordan, New York City (Allan Sloan, New York City, Adair, Goldthwaite, Stanford, Daniel & Horn, Atlanta, Ga., on the brief), for Industrial Union Dept., AFL–CIO, and Textile Workers Union of America, AFL–CIO.

Whiteford S. Blakeney, Charlotte, N. C. (Blakeney, Alexander & Machen, Charlotte, N. C., Paul, Weiss, Rifkind, Wharton & Garrison, New York City, on the brief), for J. P. Stevens & Co., Inc.

Glen M. Bendixsen, Atty., National Labor Relations Board (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Richard S. Rodin, Washington, D. C., Atty., on the brief), for respondent.

Before WATERMAN, FRIENDLY and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

This case is before us on two petitions to review and a cross-petition to enforce an order of the National Labor Relations Board issued on March 22, 1966, 157 N.L.R.B. No. 90, against J. P. Stevens & Co., Inc. ("the Company"). The Board concluded that the Company had

engaged in massive violations of sections 8(a) (1), (3) and (4) of the National Labor Relations Act, 29 U.S.C. §§ 158(a) (1), (3) and (4) ("the Act"), and found, *inter alia*, that the Company had discriminatorily discharged seventy-one employees because of their union activity.[1] The Board's order included notice provisions, some of them unusual, and required reinstatement of the improperly discharged employees. All of this is challenged by the petition to review brought by the Company. The Board also held that the General Counsel had not sustained his burden of showing discriminatory discharges of eight other employees. Six of these discharges form the basis of the other petition to review, brought by the Industrial Union Department, AFL–CIO ("the Union").[2] In its answer to the Company's petition, the Board has cross-petitioned to enforce. With minor modifications, we enforce the Board's order for reasons discussed below. The Company challenges both the Board's extensive findings[3] and its proposed remedies; we turn first to the former.

## I. THE BOARD'S FINDINGS

According to the Board, in the spring of 1963, the Union launched a campaign to organize the textile plants operated by the Company in North and South Carolina; this proceeding involves incidents in twenty of those forty-three plants. In response to the Union's appearance, the Company posted a notice on the bulletin boards in the plants which stated its "positive intention to oppose this Union and by every proper means to prevent it from coming in here." (Italics omitted.) The Company also mailed copies of the notice to its employees. In the ensuing months, the Union succeeded in signing up a substantial number of employees. In many of the plants, most of the Union members at the Union's suggestion sent joint letters to their plant manager, of which the following is typical:

This is to advise you that we, the undersigned, have joined the Textile Workers Union of America, A.F.L.–C.I.O.–CLC, and intend to help in every way that is legal to get our fellow workers to do the same.

We are aware of our rights under the law and any unlawful attempt on the part of the Company or its supervisors to interfere with the rights of Union people in this plant will be immediately referred to the National Labor Relations Board and charges against the parties involved will be filed.

The Company wrote letters in reply; the following is representative:

We have received a letter written on the stationery of the Textile Workers Union of America, AFL–CIO–CLC, informing us that you have joined that union. We are taking due note of this information.

We would like for you to understand, however, that your signing up with the union does not give you any immunity of any sort, nor any preference of any sort, nor any preference over other employees. You will be expected and required to perform your job as fully as anybody else—if you wish to remain in the Company's employment.

Thereafter, following management consultation, the Company posted on the various plant bulletin boards the names of employees who had so written and copies of the Company's reply. In the

1. The trial examiner found 69 discriminatory discharges and dismissed complaints as to 10 others. The Board disagreed as to 2 of these, raising the total of illegal discharges to 71.

2. The Union has moved to substitute Textile Workers Union of America, AFL-CIO, as the petitioner in No. 30,391 and to amend the title of the proceeding accordingly. The motion is granted and the title reflects the change. References in this opinion to "the Union," therefore, also include the substituted party.

3. The findings of the trial examiner were in large part adopted by the Board. The decisions of the examiner and the Board consume approximately 250 printed pages in the joint appendix; the briefs we have received number another 350, and the transcript runs well over 11,000 pages.

following days or months, many of these workers were reprimanded and discharged; others went to their supervisors seeking advice on how to withdraw from the Union and how to get their names "scratched" from these lists. For a time, such names were crossed off the lists.

Prior to the organizing campaign, the plants had been operated in a permissive manner. Once an employee was hired, his tenure was fairly secure; discharges were uncommon. The Company was tolerant, even lenient, in such matters as absences, work breaks, transfers, and rehirings. Formal written reports of employee reprimands, known as Personnel Action Reports or write-ups, were infrequent and occurred only where misconduct was serious or repeated. With the advent of the Union, however, this attitude changed swiftly. Issuance of write-ups, often quickly followed by discharge, became common for Union adherents. Incidents or activities that had previously been overlooked now occasioned speedy and severe disciplinary action. The examiner found:

> That this sudden tightening up, this splurge of write-ups, had little if anything to do with their work performance, as possibly affected by their interest in the Union, as [the Company] seems to infer (though it offered no evidence of it, and has not so argued) is demonstrated by the fact, among others, that as a rule there was simply no time for any effect to be shown. The normal pattern was a union meeting, generally on a weekend, at which a number of employees joined, the Company advised the same day by letter or telegram, the names received the next working day, if by letter, and the names posted, and a Personnel Action Report, or even discharge, the same day or the next. In the instance of the discriminatory dis-

charges which I have found, the triggering act was clearly the employee's advising [the Company] that he had joined the Union. The write-up or discharge, or both, followed as quickly as a pretext could be found. Frequently, it was found the same day. In many instances the write-ups would be the first ever received by the employee during a long course of employment, or the first received for many years, or the first for the same alleged dereliction.

> This record bears no other interpretation than that the write-ups given to these employees were not given them because of their work performance, but to threaten and coerce them, and to build up a case against them upon which their subsequent discharge for union activity might be defended.

The Board found that the Company also resorted to other means in its campaign to defeat the Union, such as much closer supervision of employees at work and in rest periods, surveillance of Union meetings and Union organizers, and interrogation of employees, all of which far exceeded the "proper means" of opposition referred to in the Company's original notice. In brief, the Board found that the Company followed a pattern of interference, restraint and coercion of its employees.

■ Against these factual findings, the lengthy briefs in this case create a Pirandello-like effect, so different are the realities seen by each beholder. Time after time, what to the Union and the Board is an obvious discharge for concerted activity is to the Company merely a termination for unsatisfactory job performance. The conflict, of course, has been determined by the examiner and the Board, and it should require but the briefest reiteration that such factual resolutions are not to be lightly disturbed.[4] The Company's appellate re-

---

4. E. g., NLRB v. Walton Mfg. Co., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962) (per curiam), disapproving the standard for weighing evidence promulgated in NLRB v. Tex-O-Kan Flour Mills Co., 122 F.2d 433, 438–439 (5th Cir. 1941), cited to us by the Company. Accord, Edward Fields, Inc. v. NLRB, 325 F.2d 754, 759 (2d Cir. 1963).

sponse is a blanket attack upon the entire fact-finding process in this case. Focusing mainly on the findings of discriminatory discharges, it argues that each termination was based on a proper reason only, which the Board has ignored; in effect, it accuses the examiner and the Board of massive bias. Thus, the Company devotes two-thirds of its 122-page brief to challenging each and every one of the seventy-one findings of unlawful discharge. To test this accusation, we turn to the Company's first alleged "illustration—not of fact-finding inquiry on the part of the Examiner and the Board, but of determination to convict."

William Aldridge, employed by the Company at its Republic No. 2 plant in Great Falls, North Carolina, was discharged on August 28, 1963. The Company claimed that Aldridge was fired because he let the "laps" of cotton fibers, which are processed in the carding machines Aldridge tended, run out of several machines, causing damage to one of them. The examiner did not believe the Company; he found instead that Aldridge was discharged because he had joined the Union. As support, the examiner pointed to the following evidence: Aldridge had been employed for nine years without once having received a derogatory write-up; less than three weeks before his discharge Aldridge had informed the Company of his Union membership; his name was posted on the bulletin board along with those of several others who had informed the Company they had joined; ever since then, his supervisors had more closely watched over him; Aldridge's immediate supervisor, J. T. Temple, did not testify to the nature or extent of the alleged damage to the machine; and two of the Company's witnesses could not point to any card tender having been fired for a similar offense, despite proof

that it is not uncommon for laps to run out of a machine.

The Company criticizes these findings as follows: First, it argues that contrary to the examiner's finding that two witnesses could recall no card tender ever having been fired in this card room, another worker testified that he had seen card tenders discharged before Aldridge. What the examiner allegedly "ignores" turns out to be one employee's vague statement that in the thirteen years he had been in the card room he had seen card tenders get discharged, but not in the last four or five years; he could not name one who had been fired, nor was he asked nor did he explain why these anonymous card tenders had been fired. On the contrary, the witness did admit that he had damaged machines, which his supervisors were aware of, had sometimes let a lap run through a machine, but had never even been formally reprimanded. It is not difficult to see why the examiner made no mention of this testimony of other discharges; if they did occur, they were years ago and for unknown reasons; no records to corroborate the fact that there had been other card tender discharges, nor any more detailed facts as to a single one were presented by the supervisory personnel who testified.[5]

Second, the Company states that the examiner "cavils" at the fact that Temple could not describe the nature or extent of alleged damage to the machine and "wholly disregards the fact that J. W. Wood, Jr., the superintendent of the Plant, testified without contradiction, that 'it took approximately $175.00 worth of material besides two men's labor' to repair the machine." But the examiner did note that neither Aldridge nor Funderburk, a Company witness, could see any damage. In addition, Temple, the assistant overseer of the card room, who summarily discharged Aldridge, and who claimed to have made a

---

5. In testimony the Company does not call to our attention, J. T. Temple did remember having fired one frame tender, Sinclair, in May or June of 1963, for refusing to perform his job, and another employee, Sistore, with an unspecified job, for "absenteeism," but could not recall the year.

record of the extent of the damage (but threw the paper away) could not describe what Wood so neatly put his finger on. Nor do we believe that simply because the examiner did not mention Wood's testimony he ignored it. Rather, it seems to us that he simply gave it no weight, in view of how suspect this detailed evidence was compared to Wood's poor memory demonstrated by other testimony he gave. As the examiner and the Board found:

> John Wood * * * was as vague as his superior Burns when it came to naming other employees terminated from July 1962 to July 1963 for * * * * shortcomings advanced as reasons for the termination of the employees named in the complaint in plant No. 2. * * * Nor could he remember any other employee who was given a personnel action report ["write-up"] for any of these faults during the same period.

This contrasted sharply with the Company's contention that discharges were a common thing and that the ones complained of constituted only about ten per cent of all the involuntary terminations during the period.

Finally, the Company alleges with emphasis that the examiner took no note of the testimony of a fellow card tender that he went to Aldridge in the smoking room to warn him that his laps were running out, whereupon Aldridge said, " 'Well, I don't care,' " lit another cigarette, and stayed in the smoking room for another eight or ten minutes instead of returning to his machines. We note first that in direct contradiction to this testimony Aldridge stated that he had not been in the smoking room but in the water house (toilet facility). Obviously, the examiner believed Aldridge; but more important, the entire incident appears irrelevant. There is no evidence in the record that either Temple, who told Aldridge to go home and initiated the discharge, or Wood, the plant superintendent, who apparently approved it, had any knowledge of the alleged smoking room conversation until sometime after Aldridge had been discharged. Thus, this evidence of Aldridge's asserted contempt for his job duties could not have influenced their decision to fire him. Clearly then, in making findings as to what motivated the discharge, as distinguished from the red herring of later uncovered proper grounds, the examiner and the Board were justified in not mentioning this testimony.

We note also a coincidence not mentioned by the Company but observed by the examiner in his findings with respect to Republic Plant No. 2 and alluded to in his discussion of Aldridge. The same coincidence, with variations, recurred at other plants, as the findings in the examiner's Summary show. Aldridge's name was posted on the Company bulletin board as a Union member about August 17, along with the names of six other employees. Within the next two days, three were discharged. Alarmed, two of the others went to their supervisors, one of whom was Wood to ask how to get out of the Union.[6] Wood told them they would have "to prove" to him that they were no longer for the Union. These two employees were not discharged; eleven days later Aldridge was; within two more weeks the last of the seven was terminated. To describe this evidence as supporting a finding of discriminatory discharge of Aldridge is understatement.

We have examined the evidence regarding Aldridge in so much detail because the Company evidently regards it as a prime example of Board bias. We conclude that it is nothing of the sort. We turn now to another incident which gives the flavor of what the Board found to be the Company's tactics in combating organizational activity and represents the frivolity of most of the Company's attack on the sufficiency of the evidence. The discharges challenged by

---

6. As Mrs. Frankie Couch put it, "I told [Wood] that I have five children, and that I needed my job, and I felt it was more important than a union, and he told me, well, just prove myself, that I wasn't for the union * * *."

the Company here are of father and son.[7] The former, Jess Cudd, had worked for the Company in its Whitmire plant for over fifty years,[8] starting at the age of thirteen. Both were doffers in the spinning department and were apparently the only two employees of the 700 in that plant who were active in Union organization. In the small mill town of 3,500 people with many supervisors, son Donald's overt activity assisting a Union organizer was known to the Company. Before Donald joined the Union, he had never received a write-up. After he became a member in the summer of 1963, he received two in fairly quick succession; shortly thereafter, he was fired. The Company claims that Donald's work did not improve after a write-up while that of other doffers, similarly warned, did; it asserts that Donald was fired for bad piecing of ends on four or five bobbins which allegedly came from his frames. The supervisor who fired Donald claimed to have noticed the faulty work on the bobbins beginning around five p. m., but did not bring it to Donald's attention for five more hours, allegedly because he "was thinking it over" and "hated to let the boy go." The examiner observed that during this period of delay it became too late for Donald or anyone else to check the frames and the bobbins to see whether the bad work was his. As the examiner concluded, although the supervisor "hated to let the boy go," he did, the only doffer within his recollection that he had discharged.

As to Donald's father, the Company explains that three supervisors and one non-supervisory employee testified that Jess was becoming progressively more neglectful, although in his approximately fifty years of employment prior to the advent of the Union he had been written up only once, in 1948. The actual incident culminating in his discharge came three months after the Cudds formally notified the Company of their Union membership. Jess Cudd had come to work to find three frames left over from the previous shift needing doffing, in addition to six of his own. By the end of the shift, Jess had doffed all but one. Despite his protests that he had been working as fast as he could all day, one frame remained undoffed, and he was fired.

The real reason for both firings becomes all too plain when an incident shortly prior to Jess Cudd's discharge is considered. Just before Christmas 1963, Jess had been approached by Stone, general overseer at the plant. He informed Jess that Donald, who by now had been fired, was passing out Union literature in town, and Stone suggested to Jess a plan for eliminating this problem; Jess would adopt Donald's children, quit work and collect relief payments; in that way Donald could be "run * * * off." At the same time Stone coupled his proposal with action; contrary to the Company's customary Christmas practice of giving families with children tickets exchangeable for fruit, Jess Cudd, whose son and grandchildren lived with him, was that year denied any tickets. Thus, the evidence was far more than adequate to show that both Donald and Jess Cudd were discharged not because of the quality of their work, but because of their protected Union activity.

■ We see no good reason to continue in this opinion with minute description of specific discharges. In some instances, the evidence of anti-union action is overwhelming; e. g., a loom fixer in the Victor plant was discharged after thirty-three years of excellent service with the Company; he received his first write-up a week after a supervisor questioned him about Union activity, in which he was actively involved, and added a veiled threat concerning whether the employee's daughter would be able

7. The facts are those found by the examiner, adopted by the Board and amply supported by the record.

8. Except for a short leave of absence in the 1930's to get married, and a period of about 18 months in the late 1920's when he ran a soft drink concession at the plant.

to finish college. The employee was soon fired, allegedly for refusing to co-operate, the fact being that he balked at signing a confession of poor work on a job transfer slip. In others, the facts are nearer the borderline; e. g., an employee at the Black Hawk warehouse [9] was found to have been constructively discharged following a reprimand by his superintendent for dealing in lottery tickets and being absent the two previous days. Whether he was provoked into a "forced quit" or quit voluntarily is a close question,[10] but there was substantial evidence to support the Board's finding that it was the former.

 In almost every instance, however, involuntary discharge was conceded. In those cases, the question before the Board was not whether there existed a valid ground for discharge, but whether the stated ground was the real one. If the Board's negative answer was supported by substantial evidence, its finding should not be set aside. See NLRB v. Ambox, Inc., 357 F.2d 138, 142 (5th Cir. 1966). And a discharge motivated only in part by anti-union discrimination is similarly illegal. E. g., NLRB v. L. E. Farrell Co., 360 F.2d 205, 208 (2d Cir. 1966); Socony Mobil Oil Co. v. NLRB, 357 F.2d 662, 663–664 (2d Cir. 1966) (per curiam). While a few of the findings of illegal discharge might be questionable if they stood alone, each gains color from the general pattern, particularly in the same plant. Considering the Company's unalterable opposition to the Union, the swiftness of retribution after notification to the Company of Union membership, the number of letter writers and other

known Union members who were discharged, and the failure to show comparable discipline of non-Union employees, the Company's claim of pervasive anti-employer bias that vitiates the entire fact-finding process does not hold up. That resolution of conflicting testimony is largely—or even entirely—adverse to the Company does not prove bias. NLRB v. Pittsburgh S. S. Co., 337 U.S. 656, 659–660, 69 S.Ct. 1283, 93 L.Ed. 1602 (1949); NLRB v. Dixie Gas, Inc., 323 F.2d 433, 437 (5th Cir. 1963); NLRB v. Geraldine Novelty Co., 173 F.2d 14, 18–19 (2d Cir. 1949). Moreover, the Company's broadside charge that *"not once did the Trial Examiner or the Board find any witness for the Respondent to be telling the truth, or the conflicting testimony of witnesses for the Union and the Board to be anything but the truth!"* and always turned *"indifferently away from the explanation favorably to the Respondent,"*[11] almost entirely ignores the implications of the Board's dismissal of eight complaints against the Company. In five of the six cases which the Union has appealed, the examiner and the Board held that the General Counsel had not sustained his burden of proof. It was found that illegal discrimination based on Union activity was not the proven cause of discharge or failure to rehire, but rather some legitimate basis, e. g., poor work or absenteeism.[12] In other words, the Board did not hold that the General Counsel had failed to establish a prima facie case, but that he had failed to carry his burden of persuasion. And that finding implicitly means that the examiner believed the Company's alleged

---

9. Garvis Powers, another case highlighted in the Company's brief as a particularly erroneous determination.

10. The question of whether the employee was selling lottery tickets on the job was properly ignored as irrelevant to the issue of whether he quit voluntarily, the defense offered by the Company. In any event, examination of the record shows quite plainly that the lottery accusation

was a pretext to cover the Company's displeasure with and sanction for the testimony the employee had given the day before as a Board witness.

11. Emphasis in original.

12. In the sixth case, the Board found Robert Carsey had voluntarily quit, though whether he had been driven to it by his supervisors was not free from doubt.

basis for its action to be the genuine one, albeit with some reservations.[13]

On the facts taken as a whole, there was far more to support the findings of the Company's illegal activity than the discharges alone. The sudden changes in pattern from permissiveness to harsh construction of work customs and rules has already been mentioned. Employees who became fearful when they saw fellow Union members fired and who went to their supervisors to say they wanted to get out of the Union were told they would have to prove they were through with it, for example, by reporting what the Union was up to. At the Company's Watts plant, a supervisor allowed a typewriter, a duplicating machine and one of its employees' services to be used to reproduce and circulate forms for withdrawing from the Union. And so it was that all but four of the forty-six Watts employees who had notified the Company of their Union membership resigned. Of the remaining four from the Union, one was out ill for a period of months and two were discharged in the ensuing weeks.

■ There is no room for doubt of the Board's ultimate conclusion:

[The Company], through its plant superintendents, acting in collaboration, initiated and pursued a pattern of conduct the purpose of which was to crush the union movement. With scant regard for the means employed other than their effectiveness, it interfered with, restrained and coerced its employees in the exercise of their rights under the Act, flagrantly, cynically, and unlawfully.

If there were room for such doubt, it would be demolished by the frequent evasiveness of key Company personnel in their testimony and the Company's failure to supply convincing corroborative data from records it admittedly possessed to back up some of its otherwise unsupported but crucial assertions, for example, that the discharges in dispute were just a small percentage of those comparable in the plants [14] or that the increased number of write-ups was due to higher standards, rather than being a form of interference with the unionization campaign. The Company also asserts that in some of the discharges it did not know that the employee was a Union supporter; it also claims that the increased discipline was due to unwarranted employee preoccupation with Union activity. The Board rejected these contentions and it was justified in doing so. The evidence in this record, circumstantial, see NLRB v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368 (1941), and direct, overwhelmingly supports the Board, taking into account whatever detracts from its weight. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Compare NLRB v. Getlan Iron Works, Inc., 377 F.2d 894 (2d Cir. May 23, 1967). With the few exceptions to follow, we will not discuss the evidence before the Board any further. We have reviewed the Board's findings and the evidence to support them with respect to each of the seventy-one employees discharged discriminatorily and the two denied overtime; most of the Company's charges that the evidence is insubstan-

---

13. See also the Board's handling of the testimony of Johnny Gambrell, who insisted that in his period of employment he had been absent only 8 or 10 days, and never without calling in an excuse. Tr. 4174–75, 4177–79. The examiner and the Board believed the Company's evidence, which directly conflicted with Gambrell's, finding he had been absent 28 days, 17 of which were unexcused. This led to the ultimate finding that absenteeism, not unionism, was the cause of Gambrell's discharge.

14. The examiner observed that the Company made the same unsubstantiated assertion—that the disputed discharges amounted to only 10% of the plant totals —in affidavits successfully opposing preliminary injunctive relief sought by the Board under § 10(j) of the Act, 29 U. S.C. § 160(j). See Johnston v. J. P. Stevens & Co., 234 F.Supp. 244, 247 (E. D.N.C.1964). See also Johnston v. J. P. Stevens & Co., 341 F.2d 891 (4th Cir. 1965) (per curiam) (affirming unreported denial of preliminary injunction where hearing was on affidavits only).

tial are entirely frivolous; all are without merit. We have also reviewed the six cases of discharge that are the subject of the Union's appeal. Here, too, the strength of the evidence varies, but we conclude that the Board's findings are all supported by substantial evidence and hence cannot be disturbed.

■■ Before leaving the issues dealing with substantiality of the evidence, one further matter deserves comment. As already noted, shortly after the Union appeared on the scene, the Company posted a Notice, reproduced in the margin,[15] which stated its opposition to the Union. The examiner made no finding that the Notice constituted a violation of the Act, but the Board did. Much attention has been paid in the briefs to the issue of whether the Notice—particularly the prediction in the first numbered paragraph that the Union's presence would bring "serious harm"—is coercive and illegal under section 8(a) (1). Apparently the Board has frequently characterized a substantially similar notice as an instrument of coercion. E. g., Greensboro Hosiery Mills, Inc., 162 N.L. R.B. No. 108 (Feb. 1, 1967); White Oak Acres, Inc., 134 N.L.R.B. 1145, 1149–1150 (1961). However, the Fourth and Sixth Circuits have disagreed with the Board, see Wellington Mill Div., West Point Mfg. Co. v. NLRB, 330 F.2d 579, 583 (4th Cir.), cert. denied, 379 U.S. 882, 85 S.Ct. 144, 13 L.Ed.2d 88 (1964); Surprenant Mfg. Co. v. NLRB, 341 F.2d 756, 758–760 (6th Cir. 1965). So also has the Court of Appeals for the District of Columbia, with the important qualification that "The notice may take a different coloration by virtue of the accompanying circumstances," Amalgamated Clothing Workers v. NLRB, 365 F.2d 898, 909–910 (D.C.Cir. 1966) (2–1 decision). If we had to rule on the Notice *in vacuo* we might be particularly concerned as to the Fourth Circuit's position in the light of our present doubt whether it would not have made better sense for these petitions to have been heard by that court.[16] However, there

15.

TO ALL EMPLOYEES

Since the Union is putting on a campaign to get in here, a good many questions have arisen with regard to the following matters. We have decided to state the Company's position on these subjects as clearly as we can for everybody alike:

(1) *This matter is, of course, one of concern to the Company. It is also, however, a matter of serious concern to you and our sincere belief is that if this Union were to get in here, it would not work to your benefit but, in the long run, would itself operate to your serious harm.*

(2) *It is our positive intention to oppose this Union and by every proper means to prevent it from coming in here.*

(3) *We would like to make it clear that it is not necessary, and it is not ever going to be necessary, for anybody to belong to the Textile Workers AFL-CIO Union, or any other Union, in order to work for this Company. The law of South Carolina guarantees this to you.*

(4) *Those who might join or belong to a Union are not going to get any advantages or any preferred treatment of any sort over those who do not join or belong to any Union.*

(5) *If anybody causes you any trouble at your work or puts you under any sort of pressure to join the Union, you should let the Company know, and we will undertake to see that this is stopped.*

(6) *No person will be allowed to carry on Union organizing activities on the job. Anybody who does so and who thereby neglects his own work or interferes with the work of others will be subject to discharge.*

Anybody who tells you anything contrary to the foregoing is not telling you the truth.

16. Cf. 1966 ABA Labor Relations Section 235–39, discussing a proposed "Amendment of the Act to Eliminate Races to the Circuits." The Board informed us that it uniformly takes no position as to which is the appropriate forum in controversies under 28 U.S.C. § 2112(a), but when it is the first moving party, the Board always petitions for enforcement in the circuit where the unfair labor practices occurred.

We note that the Company in this case filed petitions for review in the Fourth Circuit, the Union filed in this court, the Fourth Circuit transferred the Company's petitions to us, and a panel of this court denied the Company's motion to transfer

can hardly be disagreement with the view of the District of Columbia Court of Appeals that the words of a notice should not be' so regarded but may "take on a darker hue when viewed in the perspective of the particular setting." Whereas the Fourth Circuit found in the *West Point Mfg. Co.* case that most of the General Counsel's charges were not sustained, the "particular setting" in this case gave sufficiently dark a hue to the Notice. Since that limited basis suffices to sustain the Board's conclusion, we find it unnecessary to rule on the more general issues that have been posed.

## II. THE BOARD'S ORDER

The order entered by the Board contains the usual cease and desist and reinstatement provisions about which there can be no valid question in the light of our holding as to the substantiality of evidence. The Company's real objections to the order are to four less usual provisions, which the Board added to the examiner's recommendations. These require the Company: (1) to post the usual notice, but in all its forty-three plants in North and South Carolina, not only the twenty where unfair labor practices have been found; (2) to mail a copy of the notice to each employee at the forty-three plants; (3) to convene those employees during working time and have a responsible Company official read them the notice; and (4) in those plants, to give the Union access for one year to the Company's bulletin boards where employee notices are posted. The Board acknowledged that these provisions went beyond the conventional, but considered

them necessary "to undo the effect of the massive and deliberate unfair labor practices committed by [the Company] in its successful efforts to frustrate organization by its employees."

We are mindful that formulation of an affirmative order to remedy an unfair labor practice is " 'peculiarly a matter for administrative competence.' " Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964). Moreover, the Board has attempted to cope here with a major campaign of illegal anti-union activity, spearheaded by retaliatory discharges. It has recently been noted that:'

In regulating organizational activity, a realistic sense of priorities should lead us to recognize that an elemental fear of reprisal still poses the major threat to the free and fair elections contemplated by the act. Under these circumstances, lesser problems should not be allowed to obscure the pressing need for more effective restraints against the clear threats and discriminatory discharges that do so much to awaken the fears of many employees.

Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 140–41 (1964). We agree with those who have studied the problem of Board remedies and have concluded that a back pay award should not be "a license fee for union busting" [17] and that remedial orders should not be

---

back. There have also been called to our attention orders of the Board or a trial examiner subsequent to the one reviewed here. We wish to make two things clear: (1) Now that we have completed a thorough review of the record, we are by no means sure that our earlier refusal to transfer was correct. The Company sought, *inter alia*, review of 71 discharges and an order extensively affecting it; the Union sought review of 6 discharges. All the discharges occurred in North and South Carolina, and the impact of the order, about which serious questions of policy are raised (see part II infra) will

be directly felt in those states. The Board itself informed this court that it was in a "quandary" as to the circuit in which 'to proceed; and (2), in any event, our prior order is not controlling with regard to the proper forum to review the further Board orders, actual or potential, referred to above.

17. Staff of Subcomm. on NLRB, House Comm. on Education and Labor, 87th Cong., 1st Sess., Administration of the Labor-Management Relations Act by the NLRB 2 (Comm. Print 1961).

disapproved merely because they are imaginative.[18]

■ Taking the provisions of the Board's order in turn, we do not find inappropriate the requirement that the Company post notices in all its forty-three North and South Carolina plants. Flagrant violations occurred at each of the twenty plants involved in this proceeding where organization campaigns were instituted. The area is geographically limited and contiguous; the evidence shows that the Company's policies were not determined at individual plant levels alone. That being so, including the other twenty-three Carolina plants in the order was justified "since there is every reason to anticipate that if not deterred, [the Company] would pursue the same discriminatory policies" throughout the region. See NLRB v. Lummus Co., 210 F.2d 377, 381 (5th Cir. 1954); NLRB v. United Mine Workers of America, Dist. 2, 202 F.2d 177, 179 (3d Cir. 1953). Equally important, the Board has found that the Company's practices were "so extensive and so well-publicized that they must inevitably have had a coercive impact" at the remaining plants. Posting of Board notices at all North and South Carolina plants is therefore needed to remedy the coercive atmosphere found by the Board.

■ The requirement that the Company also mail the notice to the employees in these forty-three plants is equally proper here. At the outset of the Union campaign, the Company posted its own Notice, already discussed, on the bulletin boards in the plants involved in this case. But the Company obviously thought that mere posting would not be sufficient to drive home its point, because in addition it mailed a copy to each employee in the plants. The Board's notice is entitled to the same circulation for the same reasons. An employee who must scan the Board's notice hurriedly while at work, under the scrutiny of others, will not be as able to absorb its meaning and hence to understand his legal rights as one who reads it at home in a more leisurely fashion. These considerations justify the Board's exercise of its discretion in this unusual case; we do not imply—and indeed do not understand the Board to suggest—that such a mailing order is necessary or even desirable in most cases. NLRB v. American Laundry Machinery Co., 152 F.2d 400 (2d Cir. 1945); cf. NLRB v. United Brotherhood of Carpenters, 321 F.2d 126, 129–130 (9th Cir.), cert. denied, 375 U.S. 953, 84 S.Ct. 444, 11 L.Ed.2d 313 (1963). Mailing to all forty-three plants is proper for the reasons discussed above in connection with the posting provision.

■ However, we have more difficulty with the last two provisions of the order. The Company characterizes the requirement that its officials read the Board's notice to employees as tantamount to coercing a confession from it, citing Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); indeed, it asks of the Labor Board, " 'Upon what meat doth this our Caesar feed?' " We regard the reading requirement somewhat less emotionally and observe that the notice to be read does not in terms admit past offenses; for example, it does not contain the "cease and desist" language that so exercised Judge Learned Hand in Art Metals Const. Co. v. NLRB, 110 F.2d 148, 151 (2d Cir. 1940), relied on by the Company.[19] On the other hand, there is an element in the requirement—not of "obeisance" as the Company claims—but of some humiliation in having Company officials personally and publicly participate. It was for this reason that the Fifth Circuit, albeit without much discussion, recently refused to enforce a

---

18. See Flannery, The Need for Creative Orders Under Section 10(c) of the National Labor Relations Act, 112 U.Pa. L.Rev. 69, 90–94 (1963) ; Bok, supra, 78 Harv.L.Rev. at 124–41.

19. The Board has long abandoned the form of notice reciting cease and desist provisions. See NLRB v. Express Publishing Co., 312 U.S. 426, 438–439, 61 S.Ct. 693, 85 L.Ed. 930 (1941).

similar order, NLRB v. Laney & Duke Storage Warehouse Co., 369 F.2d 859, 869 (5th Cir. 1966), although it had enforced such a provision in the past. Jackson Tile Mfg. Co. v. NLRB, 272 F.2d 181 (5th Cir. 1959), enforcing per curiam 122 N.L.R.B. 764, 767–768 (1958); cf. Taylor Colquitt Co., 47 N.L.R.B. 225, 257, enf'd, 140 F.2d 92 (4th Cir. 1943). We have no desire to engage in humiliation of the Company; nor do we believe the reading provision was put in the order for that purpose. It was designed rather, as the Board said, "to undo the effect" of numerous and egregious unfair labor practices by insuring that the full counteracting force of the remedial order would be felt by the employees. Moreover, even posting a notice may be of some embarrassment to the Company. Balancing all of these considerations, and taking note of a recent suggestion based upon empirical research,[20] we will enforce this aspect of the order only at the twenty plants where the Board found unfair labor practices, and require the Board to afford the Company the alternative, at its option, of having the notice read by Board representatives, rather than by its own officials.[21] This alternative eliminates the necessity of participation by the Company, if it so desires, and still guarantees effective communication of the Board's order to the Company's employees.

Finally, we must consider the provision giving the Union access to the Company's bulletin boards. The Union has not achieved majority status and the Board declined to find that but for the Company's conduct it would have.[22] No unique problem of access has been shown as there was in NLRB v. S & H Grossinger's Inc., 372 F.2d 26 (2d Cir. 1967),

where no effective alternatives to access to employees on company premises were available to the union in its organizational efforts. The other authorities cited by the Board for this provision are equally distinguishable. For example, Fafnir Bearing Co. v. NLRB, 362 F.2d 716 (2d Cir. 1966), permitted access to company premises because that was the only way properly to judge a time study. Here the Board made virtually no findings concerning the issues relevant to solicitation, and made no adequate showing that the Company's bulletin boards are necessary to the Union in its organizational campaign.[23] Under these circumstances, we do not think that the Company should be forced to make them available.

With these modifications of the order, the petitions to review of the Company and the Union are denied and the Board's petition for enforcement is granted.

---

20. See Ross, Analysis of Administrative Process Under Taft-Hartley, 63 Lab.Rel. Rep. 132, 153 (1966); McCulloch, An Evaluation of the Remedies Available to the NLRB—Is There Need for Legislative or Administrative Change?, 15 Lab. L.J. 755, 767–69 (1964).

21. We do not hold that a reading provision without this alternative would never be appropriate.

22. Indeed the Union had asked the Board to issue a bargaining order on this theory as to 3 of the Company's plants, but the Board refused to do so, stating that it could not under the Act "where majority status has never been obtained."

23. Cf. Flannery, supra note 18, at 81.