388 F.2d 896
 TEXTILE WORKERS UNION OF AMERICA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
J. P. STEVENS & CO., Inc., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, and Textile
Workers Union ofAmerica, Intervenor.
 Nos. 86, 87, Dockets 31164, 31245.
 United States Court of Appeals Second Circuit.
 Argued Oct. 10, 1967.
Decided Dec. 27, 1967.
 
 Daniel B. Jordan, New York City, for petitioner Textile Workers Union.
 Whiteford S. Blakeney, Charlotte, N.C. (Blakeney, Alexander & Machen, Charlotte, N.C., and Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel), for petitioner J.P. Stevens & Co.
 Janet Kohn, Atty., N.L.R.B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Counsel, Marcel MalletPrevost, Asst. Gen. Counsel, and Glen M. Bendixsen, Atty., N.L.R.B., on the brief), for respondent.
 Before LUMBARD, Chief Judge and SMITH and FEINBERG, Circuit Judges.
 J. JOSEPH SMITH, Circuit Judge.
 
 
 1
 This case is before us on two petitions to review and a cross-petition to enforce an order of the National Labor Relations Board issued on March 6, 1967, 163 NLRB No. 24, against J. P. Stevens & Co., Inc. ('The Company'). For the second time in less than a year, the Board found that the Company had engaged in numerous violations of sections 8(a)(1), (3) and (4) of the National Labor Relations Act, 29 U.S.C. 158(a)(1), (3) and (4) ('the Act'). In J. P. Stevens & Co. v. N.L.R.B., 380 F.2d 292 (2 Cir. 1967), cert. denied, 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (December 11, 1967), we enforced with modifications an order of the Board (substantially similar to the one now before us) issued against the Company on March 22, 1966, 157 NLRB 869. The facts of that case are the background of this one.
 
 
 2
 In the spring of 1963, the Textile Workers Union of America, AFL-CIO ('the Union') undertook a concerted organizing campaign in approximately half of the Company's forty-three textile plants in North and South Carolina. The Company notified its employees of its intention to oppose the Union, and in response to letters from those of its employees who joined the Union, advising it that any interference with the rights of Union adherents would be referred to the Board, it warned that 'You will be expected and required to perform your job as fully as anybody else-- if you wish to remain in the Company's employment.' The Company subsequently posted on various plant bulletin boards the names of Union members who had written, together with copies of the Company's reply. Many of these workers were eventually discharged; others withdrew from the Union, and as they did so their names were crossed off the lists.
 
 
 3
 We summarized as follows the change in the Company's attitude toward its workers which came about with the commencement of the organizing campaign:
 
 
 4
 Prior to the organizing campaign, the plants had been operated in a permissive manner. Once an employee was hired, his tenure was fairly secure; discharges were uncommon. The Company was tolerant, even lenient, in such matters as absences, work breaks, transfers, and rehirings. Formal written reports of employee reprimands, known as Personnel Action Reports or write-ups, were infrequent and occurred only where misconduct was serious or repeated. With the advent of the Union, however, this attitude changed swiftly. Issuance of write-ups, often quickly followed by discharge, became common for Union adherents. Incidents or activities that had previously been overlooked now occasioned speedy and severe disciplinary action.
 
 
 5
 380 F.2d at 296. The Board found, in that case, that in the course of its antiunion campaign the Company had discriminatorily discharged seventy-one employees because of their union activity. We found substantial evidence to support the Board's findings.
 
 
 6
 During the course of the hearing in that case, the Company continued to discharge employees, and further unfair labor practice charges were filed with the Board. Some of these led to amendment of the complaint, and thus have already been adjudicated. Other charges were still under investigation when the hearing closed, and those, together with additional charges alleging further discharges and other acts of interference, restraint and corecion in the period from the close of the hearing in September, 1964 through May, 1965 are the subject matter of the present case.[1]
 
 
 7
 The Board found, in the decision and order now before us, that the Company repeatedly violated section 8(a)(1) of the Act by threateming reprisals, promising benefits, engaging in related acts of interference, coercively interrogating employees, creating the impression of out-of-plant surveillance of employees, requiring an employee to go home and take off an 'AFL-CIO' T-shirt, attempting to induce an employee to resign, and discriminatorily applying a no-solicitation rule. The Board also concluded that the Company, in violation of sections 8(a)(3) and (4) of the Act, discharged thirteen employees because of their union activities, four additional employees because of their union activities and because they had testified adversely to the Company in the first hearing, and one employee, not a union member, because she too had testified against the Company. The Company was also found to have violated section 8(a)(3) of the Act by discriminating against two employees in the assignment of overtime work. Finally, the Board concluded that the General Counsel had failed to prove that the discharges of six employees were unlawful.[2]
 
 
 8
 We have reviewed the Board's findings and the record with respect to each of the discharges covered in the Board's decision and order, and have found substantial evidence to support the findings. As in the earlier case, the evidence of anti-union action is overwhelming in some instances, and nearer the borderline in others. The Company points to alleged evidence of unsatisfactory work by each of the employees found to have been discriminatorily discharged. Even in those instances where we must acknowledge the existence of two fairly conflicting views of the evidence, we are of course not at liberty to displace the Board's choice between those views. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951).[3] Two discharges with respect to which the Trial Examiner and the Board disagreed as to the Company's motivation are representative of the 'close cases.' As to one, the Board reversed a finding that the Company had not violated the Act; as to the other, the Board reversed a finding of violation.
 
 
 9
 Juanita B. Faulkenberry worked as a weaver in the Company's Republic plant No. 1 for twelve or thirteen years until her discharge on October 23, 1964. She had thirty years of experience as a weaver, including jobs for two or three years at the Republic plants Nos. 2 and 3. Her work record with the Company was a good one until just prior to her discharge. On March 27, 1964, Faulkenberry gave testimony at the first hearing which partly contradicted that of her immediate supervisor, Simean Dawkins.[4] According to Faulkenberry's corroborated testimony in the hearing in this case, several weeks after her 1964 testimony, Arthur Justus, the general overseer, of weaving in the plant, began to watch her work closely. During the summer of 1964, her 'loom fixer' was replaced by a 'learner-fixer' who had never before fixed looms. In September, she was given a very difficult style of cloth to weave which, according to her testimony, made it more difficult to start up about twenty of her looms. At about this time the weaver in charge of Faulkenberry's looms on the preceding shift complained that the job was too difficult, and was transferred to another job and replaced by one Darby, who, according to Faulkenberry's uncontradicted testimony, 'would leave the warp in such a mess that it would take me two or three hours to start the looms up. * * *' Faulkenberry complained to her supervisors about Darby on a number of occasions, and requested a better loom fixer, but no action (other than promises that Darby would be spoken to about the problem) was taken. About a week before her discharge, Faulkenberry received a personnel action report for low production, which was the first warning shw had ever received. According to her own testimony, her production 'was real low.' During her last week on the job, however, she was assigned an experienced loom fixer and her production rose substantially.
 
 
 10
 On October 23, 1964, Company introduced a production change which involved doing away with a set of looms on each of the three shifts; accordingly, Faulkenberry was laid off and a weaver from each of the other shifts was assigned to other work. During the week previous to the change, the three employees taken off weaving were the lowest in production on their respective shifts. Justus and Dawkins both testified that other weavers with the same 'learner-fixer' had higher production. Justus also testified, however, that a learner-fixer and a difficult style would affect any weaver's production adversely, and Dawkins, on cross-examination, remembered having testified during the 1964 hearings that the fixer had more effect on production than did the weaver.
 
 
 11
 The Trial Examiner, after noting that 'Justus' credited testimony is that he was not aware of the improvement in (Faulkenberry's) production until after her layoff * * *,' concluded that 'Since Faulkenberry was not associated with the Union, and since her testimony at the first hearing was relatively innocuous, I do not find that the General Counsel has met the burden of proof which rests upon him and I shall recommend that the complaint be dismissed as to Faulkenberry.' The Board rejected the recommendation. It noted, among other things, that 'Faulkenberry had seniority over many other weavers,' that 'Faulkenberry's testimony at the first hearing was damaging to the Respondent's case and contradicted that of her supervisors who were later responsible for her discharge,' and that when Faulkenberry came to the personnel office asking for work at a time when the Company was hiring weavers, the Company, 'although it knew of the material increase in her production during her last week and of her desire to work, * * * hired weavers with less seniority and experience than Faulkenberry.' The Board concluded:
 
 
 12
 In these circumstances we find that the (Company's) assigned reasons for Faulkenberry's discharge were pretexts and that the real reason was that she had given testimony under the Act unfavorable to the (Company). Accordingly, we find that by discharging Juanita Faulkenberry, the (Company) violated Section 8(a)(4) of the Act.
 
 
 13
 It is clear that the conclusions of the Trial Examiner and of the Board as to the reason for Faulkenberry's discharge were based on different inferences drawn from the same record testimony. We are not assigned the task of drawing our own inferences as to the Company's motivation; so long as we find substantial evidence supporting the Board's conclusion (taking into account whatever in the record fairly detracts from its weight), that conclusion must stand. Universal Camera Corp. v. N.L.R.B., supra. The fact that the Trial Examiner reached a conclusion different from that reached by the Board would be more significant had he based his conclusion on a disbelief in Faulkenberry's testimony. See N.L.R.B. v. A.P.W. Products Co., 316 F.2d 899, 903 (2 Cir. 1963). But the examiner credited all of the testimony bearing on Faulkenberry's discharge, and his recommendation was based on what he considered to be the innocuous nature of her testimony at the first hearing. The Board concluded that the Company did not consider her testimony innocuous, and the Board was of course entirely free to determine this question for itself.
 
 
 14
 William Coker had been employed by the Company as a weaver for twenty-three years when he was dismissed from its Estes plant on May 25, 1965. Coker was active in the Union, and he was listed as a member of its organizing committee on union leaflets distributed at the Estes plant. During the latter part of October, 1964, Coker wrote a lengthy letter to a local newspaper, detailing the merits of the Union, in reply to an antiunion letter which had appeared in the same newspaper. Publication was refused, and the Union then published the letter over Coker's signature and distributed it at the plant gate. Two weeks later, Coker was transferred from the first shift, on which he had always worked, to the second shift. He thus came under the supervision of Shannon McCall, second shift overseer, who told him that the Union didn't care about the workers, but only wanted their money. Shortly thereafter, Coker was written up for reporting early for work on the second shift and talking with other employees, something he had become accustomed to doing. J. C. Blackston, general overseer of weaving at the Estes plant, testified:
 
 
 15
 Our gate opens thirty minutes before shift change; any employee is free to come in if they like. * * * Well I noticed one particular day, this particular day I had the report made out, that (Coker) was there just about at three-thirty, and I saw him talking to six different weavers; so up close to change time, I went to him and asked if he'd mind waiting until ten minutes before four to come out in the weave room * * * and he said he would be glad to, and he didn't do it any more, as far as I know.
 
 
 16
 Coker was written up again on March 26 and March 30, 1965 for not inspecting his cloth properly. On May 13, 1965 he acted as a union observer at a Board election. Two days later he received another writeup for improper inspection, and McCall outlined for him the precise procedure of proper inspecting.
 
 
 17
 On May 24, 1965, Coker was inspecting looms at the beginning of his shift, and come to loom No. 46, which had a new warp tied on. He looked only at the face of the cloth, and, noticing nothing wrong, initialed it. Coker stated that he did not follow the complete inspection procedure because the loom had a new warp, and he intended to return to it after he finished inspecting his other looms. While Coker was attending to his other looms, McCall came to loom No. 46 and noticed some torn selvage on the loom. Blackston was shown the torn portion of the cloth the next day. After noting Coker's initials on the cloth, and that the torn portion must have been running at the time Coker initialed it, Blackston concluded that Coker could not have properly inspected the cloth. Coker was discharged that day.[5]
 
 
 18
 The Trial Examiner, nothing that Coker's credited testimony was that the method of inspection he followed on May 24 was the same he had been following ever since he was employed, and that although the end purpose of inspection is to reduce seconds, Coker's seconds were fewer than average during the last two weeks of his employment, concluded:
 
 
 19
 I am persuaded that (the Company) emphasized Coker's alleged shortcomings in inspecting when it became apparent during the hearing that it could not plausibly advance his percentage of seconds as the reason for discharge, and that its real reason was his membership in the Union, particularly his activity as a member of its organizing committee and his attempted advocacy of its cause in the newspapers.
 
 
 20
 The Board disagreed. It based its conclusion that Coker was not discriminatorily discharged on the fact that in the thirteen years prior to his discharge Coker had received twelve personnel action reports, eight specifically mentioning Coker's poor inspecting, and on its acceptance of the Company's contention that uniform inspection procedures are important to its program of quality control, regardless of whether unorthodox methods of inspection might sometimes result in fewer seconds for a particular individual.[6]
 
 
 21
 Here, as in the case of Faulkenberry's discharge, the Trial Examiner and the Board drew different inferences from the same record, and we must acknowledge that on the record considered as a whole there is substantial evidence to support the Board's finding. It may well be that there is also subtantial evidence to support the examiner's conclusion, but that is just a way of saying that this was a close case. Most of the discharges, however, were anything but that.
 
 
 22
 James Hill worked in the finishing department at the Company's Slater plant. He was an early Union adherent, and took part in a union campaign in September, 1963. Hill testified that in October, 1963, he began to lose overtime, and data submitted by the Company corroborate his claim. He testified that after he filed a charge with the Board in May, 1964, he was given some overtime. On August 31, 1964, Hill helped to pass out a union leaflet on which his name appeared; immediately thereafter, his supervisors began to watch him closely. On September 4, 1964, his general shift overseer, Ed Brinkley, wrote him up for 'bothering (employees) on the job and interfering with their work.' On the writeup Hill was advised: 'Any further complaints of this nature (and) you will be subject to discharge.' When Hill inquired as to who had complained, Brinkley refused to tell him. According to Hill's testimony, credited by the Trial Examiner, either Brinkley or another overseer asked him why he did not resign his employment. Following the writeup, three anti-union employees inaugurated a hazing campaign against Hill. His reaction, understandably enough, was to ask Brinkley to stop the hazing. Thereafter, Hill came to Brinkley on a few occasions to let him know that he was not talking to other employees whenever he could avoid it. Brinkley considered this aggravating. When Hill came to him on September 14, to tell him that he had just told a fellow member of the union organizing committee that he couldn't talk to him, Brinkley 'didn't see any use in (Hill) coming to me with little things like that,' and Hill was discharged. Brinkley testified:
 
 
 23
 I told James at that time, I said, Mr. Hill, I said, I'm tired of you coming to me with these complaints about employees bothering you, and I said, as far as I'm concerned, you're through.
 
 
 24
 The Board found that Hill had been discharged and denied overtime work because of his union activity, in violation of Section 8(a)(3) of the Act.
 
 
 25
 As in most of the other discharges involved in this case, the Company's antiunion motivation in discharging Hill was patent. Another employee was dismissed for bringing leaflets into a plant and spreading them around; a Company investigation of the incident had failed to disclose who was responsible, and the employee discharged had not even been questioned during the investigation. We see no purpose in continuing to describe the individual discharges at issue in the case. We have considered the parties' arguments as to each of them and uphold the Board's determination as based on substantial evidence on the record as a whole.
 
 
 26
 The Board has once again issued an unusually broad order against the Company. We have no doubt that the circumstances call for an unusually broad order. The Trial Examiner fairly summarized the situation as follows:
 
 
 27
 The record of the 1965 hearing reflects the continued, systematic determination of this employer as revealed by the record of the 1964 hearing, to destroy the union root and branch by discharging its most active members on any pretext which might come to hand, or could be invented, by threatening to discharge others unless they come to management and renounced the Union, and by provoking the resignation of still others from (the Company's) employment. No other conclusion can be drawn than that (the Company) has largely succeeded in its purpose.
 
 
 28
 The Board's order contains the usual cease and desist, reinstatement, and back pay provisions, which are unquestionably proper.[7] In addition, the order requires the Company: (1) to post the usual notice in all of its plants located in North and South Carolina (not just in the plants where unfair labor practices have occurred); (2) to mail a copy of the notice to each employee at every plant; (3) to convene all of its employees, by departments and by shifts, and have a responsible Company official read them the notice; (4) to immediately grant to the Union (upon the Union's request) reasonable access, for a one-year period, to the Company's bulletin boards and all places where notices to employees are customarily posted; and (5) to immediately give to the Union, upon request made within ove year, a list of the names and addresses of all employees in the Company's plants in North and South Carolina.
 
 
 29
 We approved the first two requirements, in their application to all of the Company's plants in North and South Carolina, in J. P. Stevens & Co. v. N.L.R.B., supra. We approve them again, for the reasons given there, 380 F.2d at 303-304.
 
 
 30
 The third requirement, that the Company read the notice to its employees, was also contained in the order in J. P. Stevens & Co. N.L.R.B., supra. We thought that in view of a number of considerations, including the element of humiliation in having Company officials personally and publicly participate in reading the notice, the order should be enforced only at those plants where the Board found unfair labor practices, and should be modified to afford the Company the alternative of having the notice read by Board representatives, rather than by its own officials.[8] The Board has stated in its brief that in the circumstances of this case the policies of the Act may be effectuated with an order similarly limited; accordingly, the third requirement will be enforced only at those eight plants where the Board found unfair labor practices in this case, and the order is modified to provide that at the Company's option the notice will be read by representatives of the Board rather than by the Company's officials.[9]
 
 
 31
 We noted in J. P. Stevens & Co. v. N.L.R.B., supra, that the Fifth Circuit has refused to enforce an order similar to the one which we modified in that case. N.L.R.B. v. Laney & Duke Storage Warehouse Co., 369 F.2d 859, 869 (5 Cir. 1966). The District of Columbia Circuit has now, in a 2-1 decision, taken a view in accord with that of the Fifth Circuit, and has also rejected the modification which we approved in J. P. Stevens & Co. v. N.L.R.B. and which we again utilize in this case. International Union of Electrical, R. & M. Workers v. N.L.R.B., 383 F.2d 230 (D.C.Cir.1967). That court's reasoning is as follows:
 
 
 32
 Giving the company the choice of reading the notice or having a representative of the Board read it to the employees * * * creates a problem more severe than the one it supposedly solves. The practical effect of the exercise of the option is to put the imprimatur of the Board on both a particular union's activities, as well as on union activities in general, by having a representative of the Board read a notice resulting from unfair labor practices which arose because of, and from, company activity in opposition to a union's organizational activities. It follows, then, that the Board is in the position of not being completely neutral, although that is the position which the Board is legally duty bound to take. Further, we would not, sua sponte, offer as an alternative to the employer a choice between a company or a Board representative giving the public reading; such a de novo remedy would run counter to the premise that remedies should be worked out by those having the most experience and expertise in the area. 383 F.2d at 233, n. 5.
 
 
 33
 We cannot agree that having a Board official read a Board order puts the imprimatur of the Board on a particular union's activities or on unions in general. Of course the Board must be neutral in its approach to any proceedings before it, but once it has been found that an employer has acted unlawfully, the question is not how the situation can be neutrally remedied; it cannot, for a remedy is by definition not neutral. As Judge Wright of the D.C. Circuit said in dissent: '* * * adequate remedies are needed to restore the balance.' 383 F.2d at 234. The reading of a Board order by a Board official surely does nothing more to destroy the Board's neutrality than does the customary heading on notices posted by employers pursuant to Board orders stating that the employees are being notified 'pursuant to a decision and order of the National Labor Relations Board.'
 
 
 34
 We do not consider our modification in J. P. Stevens & Co. v. N.L.R.B. a departure from the principle that remedies should be worked out by those having the most experience and expertise in the area. We said in that case:
 
 
 35
 The reading provision was * * * designed * * *, as the Board said, 'to undo the effect' of numerous and egregious unfair labor practices by insuring that the full counteracting force of the remedial order would be felt by the employees. 380 F.2d at 305.
 
 
 36
 We saw an element of humiliation in having Company officials personally participate in the reading (an area in which we do not doubt our competency), and the opportunity to eliminate that element without changing the impact of the Board's remedy.[10] The Board states in this case that a reading by Board representatives will effectuate the policies of the Act. And we do not consider the order to be penal in nature. Compare Local 57, International Ladies' Garment Workers Union v. N.L.R.B., 374 F.2d 295 (D.C.Cir.), cert. denied 387 U.S. 942, 87 S.Ct. 2078, 18 L.Ed.2d 1328 (1967).
 
 
 37
 The next provision of the Board's order which we must consider is that requiring the Company to give the Union reasonable access to its bulletin boards for a period of one year. We refused to enforce a similar provision in J. P. Stevens & Co. N.L.R.B., supra, because 'the Board made virtually no findings concerning the issues relevant to solicitation, and made no adequate showing that the Company's bulletin boards are necessary to the Union in its organizational campaign.' 380 F.2d at 305. In the case before us, the Board contends that Union access to the bulletin boards is necessary in order to offset the Company's use of the boards in its campaign of coercion and in the posting of lists of employees who had joined the Union, the names of those employees who withdrew being 'scratched' from the lists. We think that in view of the Company's use of the boards in combatting the Union, giving the Union reasonable access to them will effectuate the purposes of the Act, in that it will help to restore to the employees the opportunity to hear all viewpoints. We will therefore enforce this portion of the order.[11]
 
 
 38
 The Company contends that since the Board has not limited the nature of the material which the Union may place on the bulletin boards, or the frequency of the Union's access, controversy over such questions 'could produce a veritable tangle of litigation,' and that the order places in the Union's hands a large measure of control over operations in the Company's plants, for 'by means of what it might place in front of employees while at their work, the Union could excite them, arouse them, distract them, and create widespread deterioration of morale and performance * * *' The Board's order limits the Union to 'reasonable' access to the bulletin boards. We trust that the Union will bear that in mind, and that the Company does not intend to litigate the reasonableness of every piece of material posted by the Union.
 
 
 39
 The final provision of the order requiring our attention is that which directs the Company to provide at the Union's request a list of the names and addresses of all of its employees in North and South Carolina. We do not think that this provision, in these circumstances, is designed to effectuate the policies of the Act.
 
 
 40
 The power of the Board to command affirmative action is of course remedial, and 'is to be exercised in aid of the Board's authority to restrain violations and as a means of removing or avoiding the consequences of violation where those consequences are of a kind to thwart the purposes of the Act.' Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 236, 59 S.Ct. 206, 220, 83 L.Ed. 126 (1938). The Board contends, in support of the provision in question, that the fear generated by the Company's campaign of intimidation will hinder lawful propaganda activities during nonworking time on company premises, that so far as the record shows the Union has no other effective means of personally contacting all of the Company's employees, and that it cannot be unduly burdensome on the Company to provide the list. The broad notice requirements and the provision of Union access to the Company's bulletin boards are appropriately designed to dissipate the fear in the atmosphere within the Company's plants generated by its anti-union campaign. The requirement that the Company furnish a list of its employees is, as the Board points out, designed to do more than that-- it is designed to afford the Union a means of personally contacting all of the employees. The Supreme Court has made it clear that the employer's obligations to his employees to allow them to discuss self-organization among themselves is much broader than the obligation owed nonemployee organizers; thus the access of a nonemployee organizer to the employer's property is governed by considerations different from those governing employee organizational activity on the employer's property. N.L.R.B. v. Babcock & Wilcox Co., 351 U.S. 105, 113, 76 S.Ct. 679, 100 L.Ed. 975 (1956). Compare N.L.R.B. v. S. & H. Grossinger's Inc., 372 F.2d 26 (2 Cir. 1967). In this case, the problem is nonemployee, access to an employer's list of employees, and we think that considerations similar to those governing nonemployee access to an employer's property must govern.
 
 
 41
 The employees' right which the Act was designed to protect, depend 'in some measure on the ability of employees to learn the advantages of self-organization from others.' N.L.R.B. v. Babcock & Wilcox Co., 351 U.S. at 113, 76 S.Ct. at 685. Their ability to do this may in some cases turn on a union's gaining access to a list of an employer's employees, but we do not think the Board has shown that to be the case here. The Board argues that by enabling the Union to contact all employees outside the plant and make known its views in an atmosphere relatively free of restraint and coercion, the list requirement will resuscitate to some extent the organizational opportunities that have been extinguished. The policies of the Act call instead for a change in the plant's atmosphere.
 
 
 42
 The Board refers us to its rule, announced in Excelsior Underwear Inc. and Saluda Knitting Inc., 156 NLRB 1236 (1966), that where a representation election has been scheduled the employer must file with the Regional Director a list of all the eligible voters, which will then be made available to all parties. The need for an informed electorate, cited by the Board in establishing the Excelsior Underwear rule, and cited by the Fourth Circuit recently in holding such a list compellable in a District Court proceeding, N.L.R.B. v. Hanes hosiery division-- Hanes Corporation (4 Cir., 384 F.2d 188, decided October 3, 1967), is not present in the context of a union organizing campaign.
 
 
 43
 We deny enforcement to that provision of the order directing the Company to make available a list of its employees; otherwise the Board's petition for enforcement of the order (as modified with respect to the reading of the notice) is granted, and the petitions to review are denied.
 
 
 
 [1]
 As in the first case, the charges were initially filed by Industrial Union Development, AFL-CIO
 
 
 [2]
 The trial examiner found that nineteen employees had been unlawfully discharged, and that the General Counsel had failed to prove unlawful discharge as to five. The Board affirmed as to seventeen of the nineteen found unlawfully discharged, and found in addition that one employee, who the examiner thought had been lawfully discharged, was instead discharged because she had testified against the Company in the first proceeding. The Board made numerous other changes in the examiner's findings, including the correction of the inadvertent omission to find that employee James Hill had unlawfully been denied overtime work
 
 
 [3]
 See N.L.R.B. v. Interboro Contractors, Inc., 388 F.2d 495. We pointed out in the first case, J. P. Stevens & Co. v. N.L.R.B., 380 F.2d at 296, n. 4, that the standard of review set out by the Fifth Circuit in N.L.R.B. v. Tex-O-Kan Flour Mills Co., 122 F.2d 433, 438-439 (5 Cir. 1941), was disapproved in N.L.R.B. v. Walton Mfg. Co., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962) (per curiam). The Company, with parrot-like persistence, again quotes to us the Tex-O-Kan standard
 
 
 [4]
 She testified that her loom fixer, alleged to have been discharged in violation of Section 8(a)(3) of the Act, was working very hard on a job that had been lift in real bad shape and that although she had on occasion complained to Dawkins about that fixer's slowness, she did not do so 'too much.' Dawkins testified that he had 'many' complaints from her about that fixer. The examiner characterized her contradiction of Dawkins' testimony as relatively innocuous, but the Board disagreed
 
 
 [5]
 The Company's stated reason for discharging Coker was improper inspection. Coker, however, testified: 'He said, we've been talking to you about seconds once before * * * we don't need you any more; and I said, well, okay, if that's the way you feel about it; and I says, I want you to know one thing, I says, I have tried my best to do a good job in the years I've been here, and I know you all been watching me, and have for quite a while, trying to get something on me; and I said, I guess you know that you'll have to deal with the Labor Board. * * * They just laughed, and didn't give no reply.'
 The Union argues that the examiner erred in excluding evidence that on March 24 or 25, just before the writeup of March 26, Coker was present as a potential witness at a representation hearing held to establish the bargaining unit prior to a Board election. We think that any error committed was harmless, in that both the examiner and the Board were fully aware that a number of Coker's writeups followed close upon his union activity.
 
 
 [6]
 Company witnesses testified, in effect, that improper inspecting procedures were contagious among the weavers
 
 
 [7]
 We include in these the provision that employees Rosemond and James Hill be offered overtime work in accordance with prior practice and be made whole for loss of overtime pay
 
 
 [8]
 The Company contends, as it did in J. P. Stevens & Co. v. N.L.R.B., that this requirement is tantamount to coercing a confession, and reminds us that 'During centuries past, countless thousands suffered oppression and tortures and death rather than confess they had committed wrong when they deeply and devoutly believed that they had not.' Once again, we regard the requirement somewhat less emotionally than does the Company
 The Company suggests that having the notice read by Board representatives amounts to a 'take over' of the Company's plants. We are sure that the Board has no such intention. It is also suggested that the notice, when read, should be amended so that each paragraph is headed 'The Company is ordered,' instead of 'We will not.' We see no need for such an amendment.
 
 
 [9]
 The Company states in its brief that there were unfair labor practices found in seven plants. This is in error; the Board found unlawful discharges only in seven plants, but found unfair labor practices had occurred in the Estes plant as well, although it reversed the trial examiner's finding that William E. Coker, employed at the Estes plant, had been unlawfully discharged
 Once again, we do not hold that a reading provision without this alternative of reading by Board representatives would never be appropriate. See 380 F.2d at 305, n. 21.
 
 
 [10]
 See Ross, Analysis of Administrative Process Under Taft Hartley, 63 Lab.Rel.Rep. 132, 153 (BNA 1966)
 
 
 [11]
 In granting enforcement, we take account of the Company's particularly intensive anti-union campaign, somewhat more serious than that in N.L.R.B. v. H. W. Elson Bottling Company, 379 F.2d 223 (6 Cir. 1967), where a similar requirement was granted enforcement