**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**H. W. ELSON BOTTLING COMPANY, Respondent.**

No. 17089.

United States Court of Appeals
Sixth Circuit.

June 27, 1967.

---

Elliott Moore, N.L.R.B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Atty., N.L.R.B., Washington, D. C., on brief, for petitioner.

John S. Williamson, Jr., Milwaukee, Wis., David Leo Uelmen, Goldberg, Previant & Uelmen, Milwaukee, Wis., on brief, for intervenor.

Walter S. Davis, Milwaukee, Wis., Hoebreckx, Davis & Vergeront, Milwaukee, Wis., of counsel, for respondent.

Before PHILLIPS and EDWARDS, Circuit Judges, and CECIL, Senior Circuit Judge.

EDWARDS, Circuit Judge.

Respondent, the H. W. Elson Bottling Company, operated two small plants for bottling soft drinks. Both plants were in Michigan's Upper Peninsula—one at Marquette and one at Ishpeming. Between the two plants respondent had

about 23 employees, nine of whom were college students whom the National Labor Relations Board characterized as "regular part-time employees."

At the request of Gerald Ratelle (one of Elson's full-time employees), an organizer for the Teamster's Union [1] came to Marquette, held a meeting at Ratelle's house, and signed up just one less than the number ultimately found by the Board to be a majority of Elson's employees.[2]

Upon learning of the union activity, the Elsons consulted their lawyer and embarked upon a program obviously designed to dissuade their employees from union affiliation. The program was successful in inducing employee withdrawal from the union. It also resulted in union charges that respondent had violated Section 8(a) (1) of the National Labor Relations Act, 29 U.S.C. § 158 (a) (1) (1964). The NLRB, after a full hearing, detailed the unfair labor practices it found as follows:

"The facts, in brief, are as follows. The organization of Respondent's employees was self-generated, and within several days 11 employees out of the 23 found to be in the unit [1] signed applications for membership and authorization cards. Immediately thereafter, Respondent embarked upon a campaign of coercive speeches to its employees, during which they were threatened with layoffs and the curtailment of operations, and promised wage increases. As part of its unlawful antiunion campaign, Respondent prepared two documents for its employees to sign, a withdrawal form for those who had signed union cards and a disclaimer of interest in Union representation for those who had not. The employees were then called into Respondent's office one by one, where one of Respondent's managerial officals gave them an 'opportunity' to sign one

of these two statements. In this manner, signatures were obtained from all 12 of the individuals who had signed cards and from all 11 of those who had not.[2] Thereafter, Respondent put its promised wage and commission increases into effect and rejected the Union's bargaining request because all its employees had 'voluntarily' signed the statements referred to above."

---

"1. The Trial Examiner found it unnecessary to determine unit placement of two other individuals, one of whom signed a card, as the Union's majority status would have been unaffected thereby.

"2. While the Trial Examiner found that Respondent's conduct with regard to the execution of these statements was in violation of the Act, he omitted a specific reference to it in his recommended remedy. We shall amend the remedy to bring it into conformance with the Trial Examiner's findings."

The facts upon which these findings are based do not appear to us to be seriously in dispute. But respondent's appeal is principally designed to convince us that the motivations of the Elsons were good, that the acts were not per se coercive, and that the NLRB's conclusion that these facts constituted violations of Section 8(a) (1) of the NLRA was not legally sound.

We have reviewed the whole record, and while, as the Trial Examiner observed, the Elsons might well be "ingenuous people * * * without intent to harm" their employees, they most certainly demonstrated that they did not want to and did not intend to bargain with the union. And we can conceive of few more specific methods of interfering with employees' rights freely to choose or not to choose a bargaining representative than to have each summoned to the office of the employer and there to be asked to sign a company prepared statement withdrawing from the union.

---

1. Teamsters, Chauffeurs, Warehousemen and Helpers Union Local No. 328, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

2. Twelve employees signed cards, but one of the 12 was a foreman who was held not to be a part of the appropriate bargaining unit.

On the whole record we find substantial evidence to support the finding of Section 8(a)(1) violations as described by the Board (Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951) ) and grant enforcement of its cease and desist order.

This, however, does not end our concern with this appeal. The Board was requested also to grant a bargaining order as part of the remedy for the legal violations found. See N.L.R.B. v. Delight Bakery, Inc., 353 F.2d 344 (C.A. 6, 1965). Noting, however, that the union had never achieved majority status, the Board declined to do so. It did, however, design a remedial order seeking to "redress the imbalance" created by respondent's acts. The order required the respondent to perform the following acts:

"(a) Mail a copy of the attached notice to each employee and post copies thereof at its plants in Marquette and Ishpeming, Michigan. Copies of said notice, to be furnished by the Regional Director for Region 30 (Milwaukee, Wisconsin), shall be signed by a representative of the Company. Thereafter, a copy shall be mailed to each of its employees by the Company, and additional copies shall be posted by it and be maintained by it for 60 consecutive days thereafter, in conspicuous places, including all places where notices to employees are customarily posted. Reasonable steps shall be taken by the Company to insure that said notices are not altered, defaced, or covered by any other material.

"(b) Upon request of the Union made within 1 month of this Decision, immediately grant the Union and its representatives reasonable access for a 3-month period to its bulletin boards and all places where notices to employees are customarily posted.

"(c) Upon request of the Union, make available to the Union and its representatives, at a mutually agreeable time within 3 months of this Decision, suitable facilities such as are customarily used for employee meetings so that the Union may present its views to the employees assembled on company time. Such facilities shall be made available for one 1-hour meeting at each of Respondent's two plants."

We think the first two provisions of this remedial order entirely appropriate to the facts of this record. The third proposed remedy is a novel one. It is based in part upon a measure initiated by the Board and approved by this court in Montgomery Ward v. N.L. R.B., 339 F.2d 889 (C.A. 6, 1965). There, against a background of unlawful employer restrictions on employee freedom of speech and employer antiunion speeches (albeit lawful) to employee captive audiences, this court granted enforcement to a Board order requiring equal access to such captive audiences if the company again found occasion to employ the same technique in the next representation election campaign. The instant order, however, by its terms proposes to extend the *Montgomery Ward* remedy. The proposed remedial order would grant the union two in-plant meetings—one in each plant. These meetings would be company assembled, company housed, and company paid-for. The meetings would be held regardless of whether or not the company itself had again employed this same captive audience technique for its own purposes.

Contrary to the appellant's contentions, we find no due process violations in this contemplated remedy. Republic Aviation Corp. v. N.L.R.B., 324 U.S. 793, 802, fn. 8, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). It may well be that an order such as that proposed here would be appropriate under more aggravated circumstances. We do, however, recognize that requiring the company to pay employees to listen to a union speech on company property is

fairly "strong medicine." Cf. N.L.R.B. v. Flomatic Corp., 347 F.2d 74, 78 (C.A. 2, 1965).

On consideration of this whole record, we deem the *Montgomery Ward* limitations appropriate likewise for the third remedy in the instant case. While each case offers a complex of differing facts, the following in our view differentiate the instant case from situations where the strongest sort of speech remedies might be appropriate. First, here we deal with small plants in small communities; the union involved is a big union; the company involved is a small company. Under these facts the coercive aspect of company speeches to captive audiences is not likely to be as overwhelming as might be true under other circumstances. Cf. In the Matter of W. T. Carter & Brother, 90 N.L.R.B. 2020 (1950).

Second, this record shows no problem of union access to or communication with employees of this company. N.L.R.B. v. Babcock & Wilcox Co., 351 U.S. 105, 112, 76 S.Ct. 679, 100 L.Ed. 975 (1956).

Third, this is not an instance of an obdurate employer with a long record of antiunion activity.

Enforcement of the Board's order is granted, with Paragraph 2(c) amended to conform to the speech remedy previously approved by this court in Montgomery Ward v. N.L.R.B., supra, as follows:

2(c) In the event the respondent addresses its employees on the question of union representation during the six months succeeding entry of this order, upon request of the union it shall make available to the union and its representatives on each such occasion, at a mutually agreeable time, similar facilities so that the union may present its views to the employees assembled on company time for a similar period.