NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

BUSH HOG, INC., Respondent.

No. 25593.

United States Court of Appeals
Fifth Circuit.

Dec. 26, 1968.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Arthur A. Horowitz, Warren M. Davison, Attys., NLRB, Washington, D. C., for petitioner.

William F. Gardner, J. Michael Rediker, Cabaniss, Johnston, Gardner & Clark, Birmingham, Ala., Sam Earle Hobbs, Craig, Hobbs & Hain, Selma, Ala., for respondent, Bush Hog, Inc.

Before BROWN, Chief Judge, and RIVES and McENTEE*, Circuit Judges.

RIVES, Circuit Judge:

The Board petitions for enforcement of its order against Respondent, reported at 161 N.L.R.B. 136. We grant the petition and enforce. Briefly, our views as to Respondent's objections [1] to enforcement are as follows:

### I.

■ The fact *alone* that the Examiner and the Board uniformly credit the Board's witnesses and discredit those of the Respondent is not enough to establish that the hearing was unfair because of bias or partiality. National Labor Relations Board v. Pittsburgh S. S. Co., 1949, 337 U.S. 656, 659, 69 S.Ct. 1283, 93 L.Ed. 1602, quoting with approval from Judge Hutcheson's opinion for this Circuit in National Labor Relations Board v. Robbins Tire & Rubber Co., 1947, 161 F.2d 798, 800. As the Supreme Court said in the *Pittsburgh S. S. Co.* case, supra, " * * * total rejection of an opposed view cannot of itself impugn the integrity or competence of a trier of fact." 337 U.S. at 659, 69 S.Ct. at 1285. That case does, however, further establish that credited evidence may be so incredible as to carry "its own death wound" and that discredited evidence may carry "its own irrefutable truth." 337 U.S. 660, 69 S.Ct. 1283. There have been cases in which this Circuit and others have referred to such blanket credibility resolution as some evidence of bias and unfairness. See, e. g., Local No. 3 v. NLRB, 8 Cir. 1954, 210 F.2d 325, 329, 330; NLRB v. Miami Coca-Cola Bottling Co., 5 Cir. 1955, 222 F.2d 341, 345; NLRB v. Cosco Products Co., 5 Cir. 1960, 280 F.2d 905, 908.

■ In the present case, a thorough examination of the Trial Examiner's carefully prepared decision in connection with the evidence set forth in the joint appendix has convinced us that there is no sufficient showing that the Trial Examiner was biased, partial or unfair. Likewise, the Respondent's charge that the Board was so partial and biased as to deny the Respondent a fair hearing has not been established.

### II.

■ Except for such an all-out attack on the integrity of the Examiner and the Board, the Respondent makes no serious or detailed contention that substantial evidence on the record as a whole fails to support the Board's finding that the

---

\* Of the First Circuit, sitting by designation.

1. We find it unnecessary to treat Respondent's criticisms of particular expressions of opinion included in the Examiner's decision.

Respondent interfered with, restrained and coerced its employees in violation of section 8(a) (1) of the Act [29 U.S.C. § 158(a) (1)]. We find that there was such substantial evidence.

■ The Board found many violations on the part of the Respondent as a part of its campaign preceding a Board-conducted election. The Respondent interrogated its employees about their union activities and sympathies. It promised them benefits if they would vote against the union and cease their union activities. It threatened to discontinue benefits if the union won the election. It threatened that a union victory might mean layoffs and relocation of certain operations. It warned some employees of difficulty in securing other employment if their support for the union became known. It appealed to racial prejudice, indicating that a union victory would result in racial integration of the plant.[2] It threatened that a sheriff's posse [3] was on standby in the event of a strike. The complaint alleged 52 specific instances of unfair labor practices, and the Board found many violations which cumulatively composed a picture of over-all coercion through threats, promises and interrogation.

III.

■ The Examiner and the Board found that "a substantial number of Respondent's employees are unable to read" and for that reason recommended that the usual posted notice be also read to the employees at a meeting or meetings called by Respondent for that purpose. Accordingly, Paragraph 2 (b) of the order provides:

"* * * that the Respondent, Bush Hog, Inc., Selma, Alabama, its officers, agents, successors, and assigns, shall:

* * * * * *

"(b) Within 1 week after receipt from the Regional Director of the Appendix referred to in the preceding paragraph, hold a meeting or meetings of all the employees and read to them in its entirety the Appendix attached hereto."

2. The racial prejudice issue was injected into this unfair labor practice case in a prepared speech read to the Selma plant employees by Earl Goodwin, Bush Hog Executive Vice President and General Sales Manager. The theme running through the speech was that the Teamsters Union "is just not very likely to be turning right around [after its President, James Hoffa, had contributed $25,000 to Martin Luther King's Selma March] and fighting integration." There was considerable evidence in the record to indicate that the all-white management, foremen, and employees were virtually unanimous in their anti-Negro sentiments and in their opposition to any form of integration. At least four plant officials at one time or another intimated that the company would perpetuate a segregated work force, but that a union victory would result in plant integration. A cartoon suggesting the same result was prominently displayed above the time clock.

Considered in isolation, the reminder of the undisputed fact that Hoffa donated Teamster funds to the Selma March might fall within the ambit of privileged speech guaranteed by section 8(c) of the Act, 29 U.S.C. § 158(c). Cf. Southwire Co. v. NLRB, 5 Cir. 1967, 383 F.2d 235, 239. Yet we evaluate such speech, not in a vacuum, but in the "totality of conduct." NLRB v. Virginia Electric & Power Co., 1941, 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348. Moreover, the guarantee that privileged speech lies outside the ambit of an 8(a) (1) violation is qualified by the language: "if such expression contains no threat of reprisal or force or *promise of benefit.*" (Emphasis added.) We are aware also that permissive propaganda standards are not "fixed and immutable," particularly where a racial prejudice appeal is involved. See Sewell Mfg. Co., 138 N.L.R.B. 66, 70 (1962).

Considered in context, the company plainly implied that it could preserve plant segregation while a union victory would result in a requirement that Negroes be hired. Such "speech" is unprivileged under section 8(c) and amounts to a promise of what was considered a benefit. Thus, the appeals to racial prejudice clearly violated section 8(a) (1).

3. In a totally disconnected case, United States v. Clark, S.D.Ala. 1965, 249 F. Supp. 720, 728, 729, a three-judge district court found that the sheriff used this posse "as one of his major coercive instruments in the interference with Negro rights," and enjoined its further use in racial matters.

The record and appendix disclose that, out of a total complement of approximately 190 employees, a few more (the exact number not being shown) than thirty testified for the General Counsel and that of those who testified seven admitted that they could not read. In the course of their testimony, it was not necessary to require the other 23 or more witnesses to disclose whether or not they could read. Assuming a proportion of 7 illiterates out of 30 witnesses, the Board might reasonably infer that there are as many as 44 or 45 illiterates out of the total of approximately 190 employees. Substantial evidence therefore sustains the finding that a significant number of the employees are unable to read.

■ The Respondent insists that the notice reading requirement exceeds the broad scope of discretion given the Board in fashioning remedies because it is punitive, that is, unduly embarrassing, humiliating and degrading to management. On this point Respondent's main reliance is this Circuit's decision in NLRB v. Laney & Duke Storage Warehouse Co., 1966, 5 Cir., 369 F.2d 859, 869, where, in denying a reading requirement, this Court stated:

"The requirement of the Recommended Order that the Notice be read by management to any employee who requests it, as amended by the Board to require it be read to each employee, singly or collectively, is unnecessarily embarrassing and humiliating to management rather than effectuating the policies of the Act."

That part of our Circuit's decision has received extensive consideration by the Second Circuit in J. P. Stevens & Co. v. NLRB, 1967, 380 F.2d 292, 304, 305

(J. P. Stevens I), and Textile Workers Union of America v. NLRB, 1967, 388 F.2d 896, 904, 905 (J. P. Stevens II), and also by the D.C. Circuit with Judge Wright dissenting in International Union of Electrical Workers etc. v. NLRB, 1967, 127 U.S.App.D.C. 303, 383 F.2d 230, 233, 234.

On its facts this case is clearly distinguishable from NLRB v. Laney & Duke Storage Warehouse Co., supra. In that case the degree of illiteracy was not nearly so large as in this case. There, out of 54 employees eligible to vote, two could read only a little and a third could not read at all.[4] Here, as we have seen, the Board could reasonably infer that, out of a total of about 190 employees, as many as 44 or 45 could not read. In the *Laney & Duke* case also the requirements of the order were significantly more onerous than in the present case. There the order provided in part that:

"The said notice shall also be read to each of the Respondents' employees, singly or collectively, during the 60-day period in which posting of the notice attached hereto is required."

In the present case the order leaves to Respondent the selection of the officer or agent to read the notice and the calling of the "meeting or meetings of all the employees" at which it shall be read.

■ The Respondent may be required "to give appropriate notice" to its employees that it will respect their statutory rights. Republic Steel Corp. v. NLRB, 1940, 311 U.S. 7, 12, 61 S.Ct. 77, 85 L.Ed. 6. The Board is not restricted to the method of posting customarily used, but may use alternative means of requiring effective notice.[5]

4. See 5th Cir. N.L.R.B. v. Laney & Duke Storage Warehouse Co., 369 F.2d 859, Rec. p. 110, J.A. 195–196, 323, 397–398.

5. The Board's brief collects a number of examples of appropriate alternative means. See, e. g.:

Notice mailed to employees: American Laundry Machinery Co., 152 F.2d 400, 401 (2 Cir. 1945); Marydale Products

Co., 133 N.L.R.B. 1232, enforced, 311 F. 2d 890 (5 Cir. 1963), cert. denied, 375 U.S. 817, 84 S.Ct. 53, 11 L.Ed.2d 52; Custom Quilting Corp., 134 N.L.R.B. 51; Beiser Aviation Corp., 135 N.L.R.B. 399; Electric Steam Radiator Corp., 136 N.L. R.B. 923, enforced, 321 F.2d 733 (6 Cir. 1963); N.L.R.B. v. Houston Maritime Ass'n,. Inc. et al., 117 U.S.App.D.C. 304, 329 F.2d 259 (1964), cert. denied,

Certainly the Board may exercise a broad discretion in fashioning remedies to require an employer to undo the effects of its own unlawful conduct and to effectuate the policies of the Act, though the Board has no power simply to punish the employer. Republic Steel Corp. v. NLRB, supra.

Where, as in this case, the Board has found numerous infringements of protected rights and a low literacy level among the company employees, we cannot hold that the Board abused its discretion in the notice reading requirement of the present order.

## IV.

Finally, the Respondent attacks as too broad those parts of the Board's order which we emphasize in the following quotation:

"1. Cease and desist from unlawfully questioning employees, threatening them with reprisals, promising or granting them benefits, advising them that employment policies with respect to race depend on whether or not they designate the Union, *or in any other manner* interfering with, restraining, or coercing them in the exercise of the right to self-organization, to form labor organizations, to join or assist Teamsters Local Union 612, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, Ind., *or any other labor organization*, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, as

377 U.S. 993, 84 S.Ct. 1921, 12 L.Ed.2d 1046; Star Baby Co., 140 N.L.R.B. 678, enforced as modified, sub nom., N.L.R.B. v. Neiderman, 334 F.2d 601 (2 Cir. 1964); Alabama Roofing & Metal Co., 142 N.L.R.B. 882, enforced as modified, 331 F.2d 965 (5 Cir. 1964); Tom Johnson, Inc., 154 N.L.R.B. 1352, enforced, 378 F.2d 342 (9 Cir. 1967).

Communicated through radio dispatch and letter: Red Top Cab & Baggage Co., 145 N.L.R.B. 1433, 1455.

guaranteed in Section 7 of the Act, or to refrain from any or all such activities." (Emphasis added.)

We hold that this case fairly meets the test recently recognized by this Circuit, that the Board could find such a broad order appropriate because, according to its findings, the company has demonstrated a proclivity to violate the Act in its entirety or as to certain sections. Mel Croan Motors v. NLRB, 5 Cir. 1968, 395 F.2d 154 [May 17, 1968].

The order of the Board is

Enforced.

Posted in language other than English: Peninsular Occidental Steamship Co., 132 N.L.R.B. 10, 14; John F. Cuneo Co., 152 N.L.R.B. 929; Star Lite Electronics Corp., 154 N.L.R.B. 1822; Freeport Marble & Tile, Inc., 153 N.L.R.B. 810, enforced as modified, 367 F.2d 371 (1 Cir. 1966).