417 F.2d 533
 J. P. STEVENS & CO., Inc., Petitioner-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Petitioner.
NATIONAL LABOR RELATIONS BOARD, Respondent-Petitioner,
v.
J. P. STEVENS & CO., Inc., Petitioner-Respondent.
 No. 26246.
 United States Court of Appeals Fifth Circuit.
 October 3, 1969.
 
 W. S. Blakeney, Charlotte, N. C., Whiteford S. Blakeney Charlotte, N. C., for J. P. Stevens & Co., Inc.; Blakeney, Alexander & Machen, Charlotte, N. C., of counsel.
 Marcel Mallet-Prevost, Asst. Gen. Counsel, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Elliott Moore, Lynn D. Poole, Attys., N.L.R.B., Washington, D. C., Walter C. Phillips, Director, 10th Region, N.L.R.B., Atlanta, Ga., for N.L.R.B.
 Before JOHN R. BROWN, Chief Judge, AINSWORTH, Circuit Judge and COMISKEY, District Judge.
 JOHN R. BROWN, Chief Judge:
 
 
 1
 Only three things distinguish this case from the run-of-the-mill §§ 8(a) (1), 8 (a) (3) labor cases. The first is the tenacity with which the Employer persists in the exercise of deep seated anti-union convictions. The second is the succession of formal cases culminating in the present one bearing five service stripes in which, except for minor variations, the Board's findings of spectacular Employer violations of §§ 8 (a) (1), 8(a) (3) and 8(a) (5) of the Act have been upheld by three Courts of Appeals. The third is the Board's efforts to devise some character of remedy which has at least some prospects of keeping the recalcitrant Employer's intransigence within the bounds of vigorous but lawful opposition to Union attempts to organize units in a multistate industrial complex.
 
 
 2
 As Stevens V this case, joining the list of predecessors,[1] has a like outcome. We enforce.
 
 
 3
 The Board concluded that Stevens had violated[2] § 8(a) (1) and (3) by discriminatorily discharging four employees, engaging in surveillance of Union activity, interrogating employees about Union activity, and making threats of discharging employees for Union activity and threats of closing plants if the Union[3] was recognized.
 
 
 4
 To the usual, traditional requirement of reinstatement and back pay for the § 8(a) (3) discharges and cease and desist order of § 8(a) (1) violations with posting for a specified period, the Board's order additionally required that (1) the notice to employees be read to the assembled employees on shifttime, (2) it be mailed to the employees' homes, (3) the Union, upon request, be given access for one year to the company bulletin boards and (4) the Union be furnished a list of the names and addresses of all Stevens employees working in the plants where the violations occurred.[4]
 
 
 5
 We focus on requirements of the order (d) (e) (f), and (g) since the § 8(a) (1) and (3) violations warrant no detailed treatment. In the first place, with no real concession at all, Stevens has apparently abandoned its attack on the record support for the findings of coercive surveillance of Union activity, interrogation and threats, which are classic, albeit crude, unlawful labor practices.[5]
 
 
 6
 Although Stevens does claim that there is not substantial evidence to support the finding that the four employees were discriminatorily discharged,[6] our examination of the record convinces us that in these run-of-the-mill incidents on which the Board, not the Court, has to pass upon the credibility of the witnesses, we cannot say the findings are unsupported by substantial evidence on the record as a whole. Great Atlantic & Pacific Tea Co. v. NLRB, 5 Cir., 1966, 354 F.2d 707, 709. Nor can we say the record reflects bias or unfairness on the Trial Examiner's part as Stevens seems to contend. See NLRB v. Bush Hog, Inc., 5 Cir., 1968, 405 F.2d 755; NLRB v. Dixie Gas, Inc., 5 Cir., 1963, 323 F.2d 433, 437.
 
 
 7
 But to the special requirements of the Board's[7] order (see note 4 supra) it once again levels its full but unsuccessful broadside.
 
 
 8
 Stevens has been engaged in a massive multistate campaign to prevent unionization of its Southern plants. This campaign has involved numerous flagrant unfair labor practices including coercive interrogation, surveillance, threat of plant closings, and economic reprisals for Union activity. Moreover, the threats have been made good by extensive discriminatory discharges. As a result of these practices, several unfair charges have been brought before the Labor Board (see note 7 supra) and, except for slight variations, the orders of the Board have been enforced by two other Circuit Courts of Appeal in Stevens I, II, and III and IV (see note 1 supra). As the Fourth Circuit said in assessing the company's conduct in Stevens III and IV, "the Board properly took into consideration the unfair labor practices that Stevens I and II, disclosed, and we, in turn, cannot ignore this evidence. Maphis Chapman Corp. v. NLRB, 368 F. 2d 298, 303 (4th Cir. 1966)". Stevens III and IV at 1019 of 406 F.2d. Nor can we, in our subsequent turn, ignore the unfair labor practices disclosed in Stevens III and IV. To these we add the incidents and violations found by the Board to have occurred in the Georgia plants. Thus we assay the order in this atmosphere of persistent, long continued, flagrant violations occurring after and in spite of repeated declarations of illegality by Board and reviewing Courts.
 
 
 9
 In determining whether a particular affirmative action ordered by the Board pursuant to its powers under § 10 (c), 28 U.S.C.A. 160(c), is appropriate, the reviewing Court must pay an unusually high degree of respect to the Board's conclusion — these remedies are "peculiarly a matter of administrative competence." Fibreboard Paper Products Corp. v. NLRB, 1964, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233, 241. In Virginia Electric & Power Co. v. NLRB, 1943, 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568, the Supreme Court stated it in stringent terms: "[The order] should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." at 319 U.S. 540, 63 S.Ct. 1218, 87 L.Ed. 1574. Fresh emphasis on the peculiar respect due Board determination of remedies has been given by the Supreme Court in NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547:
 
 
 10
 "It is for the Board and not the Courts * * * to make [the] determination [of remedies], based on its estimates as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of § 10(c) of the Act * * * the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing Courts." at 395 U.S. 612, 89 S.Ct. 1939, 23 L.Ed.2d 577, n. 32 (emphasis added).
 
 
 11
 And, in upholding a Board's order compelling the payment of fringe benefits as a part of the remedy for a § 8(a) (5) violation, the Court said of § 10(c) this "grant of remedial power is a broad one." NLRB v. Strong, 1969, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed. 546.
 
 
 12
 The policy behind Virginia Electric, supra, Gissel Packing Co., Inc., supra, and the many others, see, e. g., Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271, 1283; J. H. Rutter-Rex Mfg. Co. v. NLRB, 5 Cir., 1968, 399 F.2d 356, as § 10(c) expresses, is to require the recalcitrant offender "to take such affirmative action * * * as will effectuate the policies of this [Act]." That sweeping permissive command brings into play the equally broad declarations of the basic rights of employees under § 7, 29 U.S.C. A. § 157.[8] In order to enable employees to enjoy these rights, especially in lawful efforts to organize for collective representation, there are many instances in which the inescapably negative cease and desist order will not suffice. Nor is the reinstatement with backpay order universally and fully effective. In the first place, this merely assuages the direct economic injury suffered by the victims of unlawful discrimination, except to hold out some hope that the incidents will not recur because each will be met by this mild sanction, the backpay order's impact on the efforts of the remaining employees to organize is at best uncertain.[9]
 
 
 13
 In many instances the combination of a cease and desist order with reinstatement and backpay and a traditional posting of the notice will be adequate. But where the employer demonstrates not once or twice, or three or four times, but five times that it will not abide by the demands of the law, to limit the Board to these remedies would leave both the Board and the Court of Appeals in frustrating helplessness. This would be to deny the obvious Congressional purpose behind § 10(c) — to have available remedies necessary "as will effectuate" the Act.
 
 
 14
 The Courts not only may, they must, permit a good deal of flexibility and adaptation in the remedies prescribed. The obligation to respond to contemporary demands for resourceful and imaginative judicial ingenuity, Bros Inc. v. W. E. Grace Mfg. Co., 5 Cir., 1965, 351 F.2d 208, 209, n. 1, cert. denied, 1966, 383 U.S. 936, 86 S.Ct. 1065, 15 L.Ed.2d 852, ought not to be left to Judges alone. The responsibility must rest on all adjudicators.[10] Certainly, as this Court recognizes, meeting this obligation involves being hospitable to the distinctions born of differences.[11]
 
 
 15
 In light of these general principles, how fares the objections urged by a four time loser to the specific elements of the order? First, and easily dealt with, is the requirement that a notice of the Board's order (see subparagraph (d) and "Notice to employees" note 4 supra) be sent to each employee's home.[12] This requirement does not place any real financial strain on Stevens and imposes no serious technical problems. Moreover, it surely aids in dispelling the chilling effect of Stevens' practices by giving the employee an opportunity in the privacy of his home to see that someone stronger than J. P. Stevens & Co. has a voice in protecting those who wish to support the Union. Stevens I at 305 of 380 F.2d, Stevens II at 906 of 388 F. 2d, and Stevens III and IV at 1022 of 406 F.2d; Standard Oil Co. of California, W. O., Inc. v. NLRB, 9 Cir., 1968, 399 F.2d 639; NLRB v. H. W. Elson Bottling Co., 6 Cir., 1967, 379 F.2d 223.
 
 
 16
 The second element of the order requiring the Company to read the notice to the employees (see subparagraph (g) note 4 supra) would perhaps present a more difficult question if, as Stevens urges, we have to read NLRB v. Laney & Duke Storage Warehouse Co., Inc., 5 Cir., 1966, 369 F.2d 859 as the law of the Medes and Persians which altereth not. But we think Judge Feinberg in Stevens I, at 304-305 of 380 F.2d characterized our action correctly as "albeit without much discussion" and "although it had enforced such a provision in the past. Jackson Tile Mfg. Co. v. NLRB, 272 F.2d 181 (5th Cir., 1959)." While on that record, for the needs of that case, we decline to enforce a Board order requiring the employer to read a notice "to each employee, singly or collectively", because it was unnecessarily embarrassing and humiliating to management, NLRB v. Laney & Duke Storage Co., Inc., supra at 869 of 369 F.2d, embarrassment takes on a minor value when outweighed by the necessity of effectuating the policies of the National Labor Relations Act. The necessities which become exigencies are as variable as industrial life itself. Thus, in NLRB v. Texas Electric Cooperatives, Inc., 5 Cir., 1968, 398 F.2d 722 we enforced a Board order requiring the employer to read the notice because it was shown that a large number of the employees were illiterate. Moreover, in NLRB v. Bush Hog, Inc., 5 Cir., 1968, 405 F.2d 755, against a similar Laney & Duke assault, this Court also enforced a Board order requiring the employer to read the notice. There we said:
 
 
 17
 "Where * * * the Board has found numerous infringements of protected rights and a low literacy level among the company employees, we cannot hold that the Board abused its discretion in the notice reading requirement of the present order."
 
 
 18
 405 F.2d at 759.
 
 
 19
 But it misreads the categorical imperative of § 10(c) and the elasticity woven into it by Gissel and others to think that illiteracy or low intelligence levels are the only justifications for this remedy. After all, the traditional posting of the notice has a therapy beyond mere communication. In a world of widespread publicity, aided by vigilant or militant organizers, it is unlikely that a Board order or the Court enforcement of it would be unknown to the affected workers. A part of the medicine is the traditional acknowledgement that the employer has, but will not again, deny employees' rights. For repeated violations persisted in despite intervening declarations of illegality, the Board is warranted in impliedly concluding that such conduct has created a chill atmosphere of fear and, further, in recognizing that the reading requirement is an effective but moderate way to let in a warming wind of information and, more important, reassurance.[13] Certainly it is not "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Electric & Power Co. v. NLRB, 1943, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568, 1574.
 
 
 20
 We likewise enforce that part of the Board's order requiring the company to give the Union reasonable[14] access for a year to the company bulletin boards (see subparagraph (e) note 4 supra). We do this even though there was no specific showing that the Union was unable to disseminate its lawful propaganda.[15]
 
 
 21
 Here the employees who were active in the Union effort and who distributed Union literature were discriminatorily discharged. More than that, the Employer's opposition leading to illegal excesses was not localized to the Georgia plants. Employees, too, may get the word. And that word was the story revealed by Stevens I, II, III and IV. The warning was there for all to heed. And yet communication of a desire to try — if not to succeed — in organizing for collective action in dealing with this huge and powerful business is one of the basic aims of the Act. But how to communicate when history proves that identifiable activity imperils the job of the actor? In light of the fear and reluctance on the part of the employees to engage in lawful solicitation that Stevens' conduct must have engendered — a likelihood which § 8(a) (1) and (3) show was within congressional contemplation — providing the Union with access to a bulletin board was clearly not a "patent attempt to achieve ends other than those which can be fairly said to effectuate the policies of the Act." Virginia Electric, supra. Surely, the Board could conclude that this rather impersonal outlet for Union views was necessary to eliminate the employees' apprehension of incurring the risk of discharge or other retaliation if they engaged in personal solicitation either in or out of the plant.[16] See NLRB v. H. W. Elson Bottling Co., 6 Cir., 1967, 379 F.2d 223.
 
 
 22
 For like reasons we enforce the portion of the Board's order requiring Stevens to make available to the Union a list of the names and addresses of the plants' employees. (See subparagraph (f) note 4 supra.) Stevens argues that the Board's remedy is not appropriate because the "obvious and unabashed objective behind this `remedy' is to aid the Union in organizing Stevens' employees * * *."
 
 
 23
 That it may be. But so is a publicized cease and desist order or wild-fire awareness of a reinstatement and backpay order for four employees. See Stevens II at 905-906 of 388 F.2d. On the surface, this may appear to be making the lot of the Union easier. But, it is being made easier solely because the employer has made that lot harder than the law tolerates.
 
 
 24
 It bears emphasis that the protected collective activity — and conversely the object of formidable employer opposition — was attempting to organize. A remedy "to effectuate the policies of * * * this [Act]", § 10(c), must dispel, compensate for, or at least neutralize, the frustrating effects of persistent illegal activity. One way, of course, is to assure accurate, effective communication by methods or means which can be demonstrably free from employer retaliation.[17] A list of names and addresses affords two ready ways insulated from discriminatory reprisal — (1) personal visitation and (2) direct mail.
 
 
 25
 And, while invoked and enforced here to meet the exigencies of unregenerate employer illegality, this remedy gives a certain symmetry in the administration of the Act. Quite apart from, and even in the absence of, employer unfair labor practice opposition, the Board has the power to compel the employer to furnish the names and addresses of employees prior to, and as a part of, a board conducted election. The Board's Excelsior rule, earlier upheld by this and the Fourth Circuit[18] was expressly approved in NLRB v. Wyman-Gordon Co., 1969, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709.[19]
 
 
 26
 This nominally puts us in opposition to the Second Circuit's holding in Stevens II, at 905 of 388 F.2d, in which that Court relied on NLRB v. Babcock & Wilcox Co., 1956, 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975, which denied non-employees access to the company's property for distribution of Union literature. But not really, for that Court, virtually confessing its own mistake in having denied a transfer of Stevens I, at 306 n. 16 of 380 F.2d, from the Second to the Fourth Circuit where geographically "the action is", would undoubtedly now enforce this provision because, first, the Fourth Circuit has done so in Stevens III and IV at 1022-1025 of 406 F.2d, and second, Stevens III, IV and V prove that the remedy of Stevens II was not stringent enough.[20]
 
 
 27
 As the leitmotif in this opus in a major or minor key is the necessity that, within permissible limits, the remedy be tuned to the exigencies of the case, we would emphasize as do all the cases approving adaptability that this opinion does not stand as a precedent for the use of any one or more or all of subparagraphs (d) (e) (f) (g) (see note 4 supra) in any particular case. It all depends.
 
 
 28
 We deny the petition for review and grant the cross-petition to enforce.
 
 
 29
 Order enforced.
 
 
 
 Notes:
 
 
 [1]
 For ease of reference we continue the numerical identification employed by the Fourth Circuit inStevens III and IV:
 Stevens I: J. P. Stevens & Co. v. NLRB, 2 Cir., 1967, 380 F.2d 292, cert. denied, 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600.
 Stevens II: Textile Workers Union of America, A.F.L.-C.I.O. v. NLRB, 2 Cir., 1967, 388 F.2d 896, cert. denied, 1968, 393 U.S. 836, 89 S.Ct. 112, 21 L.Ed.2d 107.
 Stevens III and IV: J. P. Stevens & Co. v. NLRB, 4 Cir., 1968, 406 F.2d 1017.
 The present case, which reviews the Board's June 12, 1968 order, will be referred to as Stevens V.
 
 
 [2]
 The violations in this case occurred in Stevens' Dublin, Georgia plants, which are two of approximately 70 plants operated by the company throughout North and South Carolina and Georgia, in which the company is engaged in the manufacture and sale of cloth goods and other products
 
 
 [3]
 The union involved in this case is the Textile Workers Union of America
 
 
 [4]
 The order provided:
 "(d) Inform the employees of their rights under the Act and assure them that Respondent will not engage in the conduct from which it is ordered herein to cease and desist, and that Respondent will comply with the affirmative requirements of this order by mailing a copy of the attached notice marked "Appendix A" to each employee of its Dublin and Nathaniel plants, Dublin, Georgia, and posting copies thereof at the said plants for 60 consecutive days thereafter, in conspicuous places, including all places where notices to employees are customarily posted. Reasonable steps shall be taken by the Respondent to insure that said notices are not altered, defaced, or covered by any other material."
 "(e) Upon request of the Union, immediately grant the Union and its representatives reasonable access at the Dublin and Nathaniel plants, for a 1-year period, to its bulletin boards and all places where notices to employees are customarily posted."
 "(f) Upon request of the Union, made within 1 year of the issuance date of this Decision, immediately give to the Union a list of the names and addresses of all employees in its Dublin and Nathaniel plants."
 "(g) Convene during working time, by departments and by shifts, all its employees in the said plants, and a responsible official of the Respondent, at department supervisor level or above, or a Board agent shall read to department employees the contents of the attached Appendix A."
 "(h) Notify the Regional Director for Region 10, in writing, within 10 days from the date of the Order, what steps have been taken to comply herewith."
 The notice to be read and mailed to employees reads:
 "NOTICE TO ALL EMPLOYEES
 Pursuant To
 The Recommended Order Of A Trial Examiner Of The National Labor Relations Board and in order to effecuate the policies of the National Labor Relations Act
 we hereby notify our employees that: WE WILL NOT discharge any employee because of union activities or for antiunion reasons or for filing charges with the Labor Board.
 WE WILL NOT spy on union meetings or on employees attending them or on any union activities.
 WE WILL NOT threaten employees with loss of jobs or the closing or moving of the plant or with any kind of different treatment because they attended union meetings or engaged in union activities or chose a union to represent them.
 WE WILL give back to Robert Brown, Rollin Dewitt Loyd, Larry Kelley, and Larry Greenway their jobs and seniority, and we will make up the pay they lost and also pay them 6 percent interest.
 The National Labor Relations Act gives all employees these rights:
 To organize themselves
 To form, join, or help unions
 To bargain as a group through a representative they choose
 To act together for collective bargaining or other mutual aid or protection
 To refuse to do any or all of these things
 WE WILL NOT interfere with any of these rights, including your rights to join or assist TEXTILE WORKERS UNION OF AMERICA, AFLCIO, or any other union of your choice.
 J. P. STEVENS & CO., INC.
 (Employer)"
 
 
 [5]
 See [surveillance] NLRB v. Southland Paint Co., 5 Cir., 1968, 394 F.2d 717, 719-720; NLRB v. Borden Co., 5 Cir., 1968, 392 F.2d 412, 414, n. 3; NLRB v. Citizens Hotel Co., 5 Cir., 1963, 313 F.2d 708; [interrogation] NLRB v. Camco, Inc., 5 Cir., 1965, 340 F.2d 803, 807, cert. denied, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339; NLRB v. Griggs Equipment Inc., 5 Cir., 1962, 307 F.2d 275, 278; [threats] Textile Workers Union of America v. Darlington Mfg. Co., 1965, 380 U.S. 263, 274, n. 20, 85 S.Ct. 994, 1001, 13 L.Ed.2d 827, 836; NLRB v. Neuhoff Bros. Packers, Inc., 5 Cir., 1967, 375 F.2d 372, 374
 
 
 [6]
 Stevens was charged with discriminatorily discharging six employees. The Trial Examiner found that two of the discharges were for cause. The Board approved this finding and it is not challenged here
 
 
 [7]
 The portions of the order to which the company vigorously objects were not part of the Trial Examiner's recommended order, but were added by the Board. The Board stated its reasons as follows:
 "In its exceptions, the Charging Party requested the Board to grant an order similar to that granted in J. P. Stevens & Co., Inc., 167 NLRB No. 38, with some extension of its scope. Upon review of all the relevant factors herein, including the Respondent's company-wide history of extensive unfair labor practices as reflected by our decisions in J. P. Stevens & Co., Inc., (I), 157 NLRB 869, J. P. Stevens & Co., Inc. (II), 163 NLRB No. 24; J. P. Stevens & Co., Inc. (III), 167 NLRB No. 37, and J. P. Stevens & Co., Inc. (IV), 167 NLRB No. 38, we are persuaded that `the conventional remedies would not be adequate to disabuse the employees of the effects of the Respondent's flagrant conduct. * * *' Accordingly, we shall conform our order herein to that adopted by the Board in J. P. Stevens (IV). We shall, however, modify the scope of the J. P. Stevens (IV) Order, by requiring Respondent herein to mail copies of the notice to employees of the Dublin and Nathaniel plants, to post copies at the Dublin and Nathaniel plants, and to furnish the Union a list of employees at these plants."
 The Board, however, refused to accede to the Union's demand that Stevens also be ordered to give to the Union access to the company parking lots to distribute literature and give the Union an opportunity to reply to any antiunion speech made by company personnel.
 
 
 [8]
 "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title."
 29 U.S.C.A. § 157.
 
 
 [9]
 There is a substantial danger that the backpay award has degenerated into "a license fee for union busting." Staff of Subcommittee on NLRB, House Committee on Education and Labor, 87th Cong., 1st Sess., Administration of the Labor-Management Relations Act by the NLRB 2 (Comm. Print 1961). See alsoStevens I, at 303-304 of 380 F.2d.
 
 
 [10]
 Resourceful and imaginative NLRB orders are essential. The labor-management relations of industry are varied and complex. Courts of Appeals cannot require the Board to use only round pegs when the holes may be square, triangular, rectangular, or even pentagonal. See Bok, The Regulation of Campaign Tactics in Representation Elections under the National Labor Relations Act, 78 Harv.L.Rev. 38, 124-41 (1964); Note, The Need for Creative Orders under Section 10(c) of the National Labor Relations Act, 112 U.Pa.L.Rev. 69, 90-94 (1963); Note, A Survey of Labor Remedies, 54 Va.L.Rev. 38, 94-95 (1968)
 
 
 [11]
 Thus, this Court has held that when an employer has shown a "proclivity" to violate the Act, the Board can frame its order to cease and desist in broad terms — cease and desist from "in any manner" interfering with employee rights — while if no "proclivity" to violate the act is shown, the Board must limit the scope of the order more nearly to the conduct of the particular case. South-wire Co. v. NLRB, 5 Cir., 1967, 383 F.2d 235; NLRB v. Bama Co., 5 Cir., 1965, 353 F.2d 320
 
 
 [12]
 Although the Board usually requires only that the notice be posted on the Company bulletin board, the Board has often used alternative means to insure the notice is communicated to the employees. See NLRB v. Bush Hog, Inc., 5 Cir., 1968, 405 F.2d 755, 758 n. 5
 
 
 [13]
 The Second and Fourth Circuits have approved the requirement that the notice be read to the employees in all the previous Stevens casesStevens I, at 304-305 of 380 F.2d; Stevens II, at 904 of 388 F.2d; Stevens III and IV, at 1022 of 406 F.2d. See also Judge Wright's dissent in International Union of Electrical, R & M Workers, A.F.L.-C.I.O. v. NLRB, 1967, 127 U.S.App.D.C. 303, 383 F.2d 230, 234.
 
 
 [14]
 There are ample resources to assure that the Union will abide by the Board's limitation to "reasonable access." This limitation should prevent the Union, as Stevens fears, from taking over control of the Company's plant
 
 
 [15]
 The portion of the order giving the Union reasonable access to Company was not enforced by the Second Circuit inStevens I, at 305 of 380 F.2d, but in Stevens II, at 905 of 388 F.2d, on a record the Company says was identical with Stevens I, that Court enforced the order. Of course, by this time the Board and Court had seen the ineffectiveness of the order in Stevens I.
 
 
 [16]
 When an employer has engaged in massive unfair practices, there can be a resulting fear of reprisals that must be dispelled before the situation is restored. See Bok, The Regulation of Campaign Tactics in Representation Elections under the National Labor Relations Act, 78 Harv.L.Rev. 38, 140-41 (1964); Note, The Need for Creative Orders under Section 10(c) of the National Labor Relations Act, 112 U.Pa.L.Rev. 69, 90-94 (1963)
 
 
 [17]
 The list of employees serves to complement the bulletin board requirement. See subparagraph (e) note 4supra.
 
 
 [18]
 Howell Refining Co. v. NLRB, 5 Cir., 1968, 400 F.2d 213; NLRB v. Hanes Hosiery Div., 4 Cir., 1967, 384 F.2d 188
 
 
 [19]
 Even after grant of certiorari inWyman-Gordon, we adhered to Howell, note 18 supra, and granted summary reversal in Groendyke Transport, Inc. v. Davis, 5 Cir., 1969, 406 F.2d 1158, which was one of the early cases in the Fifth Circuit's precalendaring judicial screening procedure. See Murphy v. Houma Well Service, 5 Cir., 1969, 409 F.2d 804.
 
 
 [20]
 As do we, the Fourth Circuit inStevens III and IV, at 1024, found support in the Excelsior analogy. See note 18 supra and related text.